## PENNSYLVANIA RAILROAD CO. ET AL.
## *v.* RYCHLIK.

No. 56. Argued December 10–11, 1956.—Decided February 25, 1957.

*Richard N. Clattenburg* argued the cause for the Pennsylvania Railroad Co., petitioner. With him on the brief were *John B. Prizer, Percy R. Smith* and *Hugh B. Cox.*

*Henry Kaiser* argued the cause for the Brotherhood of Railroad Trainmen, petitioner. With him on the brief were *Gerhard P. Van Arkel, Eugene Gressman* and *Wayland K. Sullivan.*

*Norman M. Spindelman* and *Meyer Fix* argued the cause and filed a brief for respondent.

Briefs of *amici curiae* urging reversal were filed by *Solicitor General Rankin* and *Assistant Attorney General Hansen* for the United States, *Clarence M. Mulholland, Edward J. Hickey, Jr.* and *Richard R. Lyman* for the Railway Labor Executives' Association, and *Clarence E. Weisell* and *Harold N. McLaughlin* for the Brotherhood of Locomotive Engineers.

MR. JUSTICE HARLAN delivered the opinion of the Court.

Petitioner Brotherhood of Railroad Trainmen is the collective bargaining representative for trainmen employed by the petitioner Railroad. In accordance with Section 2, Eleventh (a) and (c) of the Railway Labor Act,[1] the Brotherhood and the Railroad negotiated a

---

[1] 64 Stat. 1238 (1951), 45 U. S. C. § 152, Eleventh (a) and (c). These and other pertinent provisions of the statute are discussed later.

union-shop contract in 1952, which required trainmen employed by the Railroad to become members of and retain membership in the Brotherhood or in another labor organization "national in scope" and "organized in accordance with" the Railway Labor Act. Respondent Rychlik was employed as a trainman by the Railroad and was a member in good standing of the Brotherhood until February 1953. At that time he resigned from the Brotherhood and joined the United Railroad Operating Crafts (UROC), a competing union which respondent believed in good faith to be "national in scope" and "organized in accordance with" the Act, and therefore available for alternative membership under Section 2, Eleventh and the union-shop provision of the contract, even though UROC had never qualified itself under Section 3, First of the Act as one of the unions "national in scope" eligible to elect the labor members of the National Railroad Adjustment Board.[2] On July 31, 1954, Rychlik, continuing his membership in UROC, also joined the Switchmen's Union of North America, concededly a union "national in scope" within the meaning of the statute and the contract.

Following his resignation from the Brotherhood, Rychlik was charged with violation of the union-shop agreement. He received two hearings before a "System Board of Adjustment," a body established under the agreement, pursuant to Section 3, Second of the Act,[3] to settle contract disputes, and composed of two representa-

---

[2] 48 Stat. 1189 (1934), 45 U. S. C. § 153, First.

[3] 48 Stat. 1193 (1934), 45 U. S. C. § 153, Second. This Section authorizes carriers and unions to set up "system, group, or regional boards of adjustment" to decide disputes otherwise within the jurisdiction of the National Railroad Adjustment Board, with a right in any party, dissatisfied with such an arrangement, to return to the jurisdiction of the Adjustment Board upon 90 days' notice. No such election was made here.

tives each from the Railroad and the Brotherhood.[4]    This Board determined that membership in UROC did not satisfy the union-shop provision of the contract, which mirrored the requirements of the Act, and that therefore Rychlik had failed to maintain continuous union membership in accordance with the contract, not having joined the Switchmen's Union until some 16 months after resigning from the Brotherhood.   Accordingly, Rychlik was discharged by the Railroad.

Rychlik, on behalf of himself and other employees of the Railroad similarly situated, thereupon brought this class suit in the United States District Court for the Western District of New York, seeking an injunction compelling petitioners to accept him as a member of the Brotherhood and an employee of the Railroad.   He alleged that his discharge violated Section 2, Eleventh of the Railway Labor Act, and that the System Board's determination to the contrary could not be final and binding, since the presence on that Board of two representatives of the Brotherhood created an inherent and fatal bias which vitiated the proceeding.   The District Court granted petitioners' motion to dismiss the complaint for lack of jurisdiction and for failure to state a cause of action.[5]   The Court of Appeals for the Second Circuit

---

[4] The first hearing was on August 27, 1953, at which time the Board postponed decision pending further exploration into the status of UROC.   The second hearing was on August 23, 1954.   In the interim, Rychlik, on July 31, 1954, had joined the Switchmen's Union, and presented evidence of that membership at the second hearing.   Rychlik's employment was continued until shortly after the Board's adverse decision on January 3, 1955.

[5] 128 F. Supp. 449.   The District Court, holding in effect that its jurisdiction to review the System Board was limited to ascertaining whether the Board had acted within the scope of its statutory and contract authority and whether its decision was free of fraud or corruption and the hearing consonant with procedural due process, found that no such infirmities had been shown, and in particular that

reversed and remanded for review on the merits of the System Board's decision that membership in UROC did not satisfy the Act.[6] Accepting the premise that Section 2, Eleventh (c) conferred on respondent a right to belong to any union which is, *in fact*, "national in scope" and organized in accordance with the Railway Labor Act, even though it has not qualified under Section 3, First of the Act as an elector of labor representatives on the National Railroad Adjustment Board,[7] the court held (1) that, although the System Board had jurisdiction over this dispute between Rychlik and the Brotherhood,[8] its decision that UROC was not a union "national in scope" was subject to full review on the merits, because of the bias which must be attributed to a body half of whose members represented the Brotherhood, a party in interest; and (2) that this bias was not cured by the availability of the alternative procedure provided by Section 3, First of the Act, whereby it can be established that a union is "national in scope" and organized in accordance with the Act.[9] Because of a conflict be-

the presence of two Brotherhood representatives on the System Board did not automatically vitiate its proceedings. It further held that Rychlik's belated membership in the Switchmen's Union did not satisfy the statutory and contract requirements of continuous maintenance of membership in a qualified union, and that the court need not decide whether UROC was a labor organization "national in scope," since, under Section 3, First (f) of the Railway Labor Act, determination of that question was within the exclusive competence of the National Mediation Board. See pp. 487–488, *infra*.

[6] 229 F. 2d 171.

[7] The briefs below show that the validity of this premise was not challenged by any of the parties before the Court of Appeals.

[8] As to this issue the Court of Appeals relied on its previous decision in *United Railroad Operating Crafts* v. *Wyer*, 205 F. 2d 153.

[9] Neither in the Court of Appeals, nor here, has Rychlik claimed that his membership in the Switchmen's Union made his discharge illegal. In both courts he has stood only upon his membership in UROC.

tween the decision of the court below and an earlier deci-
sion of the Court of Appeals for the Sixth Circuit,[10] and
the importance of these questions in the administration
of the Railway Labor Act, we granted certiorari. 351
U. S. 930.

On our view of the case we do not reach either question
decided by the Court of Appeals, for we disagree with its
premise as to the meaning of Section 2, Eleventh (c).
For reasons hereafter given, we hold that Section 2,
Eleventh (c) allows alternative union membership only
in those unions which have already qualified under Sec-
tion 3, First of the Act, as electors of the union repre-
sentatives on the National Railroad Adjustment Board,
and not membership in any union which happens to be, as
a matter of fact, national in scope and organized in
accordance with the Railway Labor Act. Since UROC
was not so qualified, respondent had no federal right to
join it in lieu of the authorized bargaining representative
under the union-shop provision of the Railroad-Brother-
hood contract. His discharge by petitioners therefore did
not give rise to a federal cause of action.[11]

In order to clarify the reasons for these conclusions, a
brief outline of the relevant provisions of the Railway
Labor Act is necessary. Section 2, Eleventh (a) of that
Act authorizes railroads and labor unions to establish a
union shop, that is, an agreement requiring as a condition
of continued employment that employees join the union
designated as their authorized bargaining representa-
tive.[12] Section 2, Eleventh (c) then provides that in the

---

[10] *Pigott* v. *Detroit, Toledo and Ironton R. Co.*, 221 F. 2d 736.

[11] No contention is made that, apart from the statute, respondent
had a cause of action on the union-shop contract itself, that is, that
the contract conferred on him rights wider than those given as a
matter of federal right by the statute. On such a cause of action
federal jurisdiction would depend on showing diversity of citizenship.

[12] "Notwithstanding any other provisions of this Act . . . any
carrier or carriers as defined in this Act and a labor organization

case of *operating* employees the union-shop provision of a contract will be satisfied if an employee is a member of "any one of the labor organizations, *national in scope, organized in accordance with this Act* and admitting to membership employees of a craft or class in any of said services . . . ." [13]

or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this Act shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership." 64 Stat. 1238 (1951), 45 U. S. C. § 152, Eleventh (a).

[13] Italics supplied. The full text of the section is: "The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service . . . if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this Act and admitting to membership employees of a craft or class in any of said services; and no [checkoff] agreement made pursuant to subparagraph (b) shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: *Provided, however,* That as to an employee in any of said services on a particular carrier at the effective date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this Act and admitting to membership employees of a craft or class in any of said

Section 3, First establishes the National Railroad Adjustment Board (NRAB), an agency designed to settle disputes arising under collective bargaining agreements. Subsection (a) provides that this Board shall consist of 36 members, 18 selected by the carriers, and 18 "by such labor organizations of the employees, *national in scope,* as have been or may be *organized in accordance with the provisions of section 2 . . . ."* [14] Subsection (f) then states that if a dispute arises as to the right of a union to participate in the election of the labor representatives on the NRAB, the Secretary of Labor will notify the Mediation Board if he feels the claim has merit.[15] The Mediation Board then constitutes a "board of three," consisting of one representative of the claimant union, one representative of the unions already entitled to elect the labor members of the NRAB, and one neutral member selected by the Mediation Board. This board of three then decides whether the claimant union is entitled to be an elector for the NRAB, that is, whether it is "organized in accordance with section 2 . . . and

---

services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: *Provided, further,* That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services." 64 Stat. 1238 (1951), 45 U. S. C. § 152, Eleventh (c).

[14] 48 Stat. 1189 (1934), 45 U. S. C. § 153, First (a). (Italics supplied.)

[15] The National Mediation Board was set up by Section 4, First of the Act. 48 Stat. 1193 (1934), 45 U. S. C. § 154, First. It is an independent federal agency with three members, appointed by the President with the advice and consent of the Senate. Its function, in the main, is to try to settle "major" disputes in the railroad industry, which are not within the jurisdiction of the NRAB.

is otherwise properly qualified to participate in the selection . . . ." [16]

At first glance the language of Section 2, Eleventh (c) would appear to be disarmingly clear: union-shop contracts are satisfied if the employee belongs to any union which happens to be national in scope and organized in accordance with the Act. And if that be its meaning we would then have to deal with the questions reached by the Court of Appeals. However, as so often happens, when the language of the statute is read, not in a vacuum, but in the light of the policies this Section was intended to serve,[17] it becomes clear that the purpose of Congress was not, as respondent contends, to give employees in the railroad industry any blanket right to join unions other than the authorized bargaining representative, or to help

---

[16] The full text of subsection (f) is: "In the event a dispute arises as to the right of any national labor organization to participate as per paragraph (c) of this section in the selection and designation of the labor members of the Adjustment Board, the Secretary of Labor shall investigate the claim of such labor organization to participate, and if such claim in the judgment of the Secretary of Labor has merit, the Secretary shall notify the Mediation Board accordingly, and within ten days after receipt of such advice the Mediation Board shall request those national labor organizations duly qualified as per paragraph (c) of this section to participate in the selection and designation of the labor members of the Adjustment Board to select a representative. Such representative, together with a representative likewise designated by the claimant, and a third or neutral party designated by the Mediation Board, constituting a board of three, shall within thirty days after the appointment of the neutral member, investigate the claims of the labor organization desiring participation and decide whether or not it was organized in accordance with section 2 hereof and is otherwise properly qualified to participate in the selection of the labor members of the Adjustment Board, and the findings of such boards of three shall be final and binding." 48 Stat. 1190 (1934), 45 U. S. C. § 153, First (f).

[17] See Frankfurter, *Some Reflections on the Reading of Statutes*, in The Record of the Association of the Bar of the City of New York, Volume 2, No. 6 (1947).

dissident or rising new unions recruit new members. Rather, the sole aim of the provision was to protect employees from the requirement of dual unionism in an industry with high job mobility, and thus to confer on qualified craft unions the right to assure members employment security, even if a member should be working temporarily in a craft for which another union is the bargaining representative. And this right is given only to those unions which have already qualified as being "national in scope" and "organized in accordance with" the Act for the purpose of electing the union members of the NRAB under Section 3.

## I.

The purposes to be served by Section 2 are clearly revealed by its history. Until 1951 the Railway Labor Act did not permit union-shop contracts in the industry.[18] In that year the Congress, persuaded by the established unions that it is unfair to allow nonunion employees to enjoy benefits obtained by the union's efforts in collective bargaining without paying any of the costs, passed Section 2, Eleventh of the Act, which authorized the union shop.[19] However, the hearings on the bill [20] revealed a problem, peculiar to the railroad industry, in establishing the union

---

[18] In 1934 a prohibition against the union shop and the checkoff was put into the Railway Labor Act at the request of the unions themselves, since employers had used these devices to establish and maintain company unions. See S. Rep. No. 2262, 81st Cong., 2d Sess., pp. 2–3 (1950); Hearings before the House Committee on Interstate and Foreign Commerce, on H. R. 7789, 81st Cong., 2d Sess., pp. 3–4, 7–8, 16–17 (1950).

[19] See id., at pp. 10, 28, 29, 37; H. R. Rep. No. 2811, 81st Cong., 2d Sess., p. 4 (1950).

[20] Hearings before the House Committee on Interstate and Foreign Commerce, on H. R. 7789, 81st Cong., 2d Sess. (1950); Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare, on S. 3295, 81st Cong., 2d Sess. (1950).

shop. Labor in this industry is organized largely on craft rather than industrial lines. Engineers, firemen, trainmen, switchmen, brakemen, and conductors, for example, each are separately organized for the purposes of bargaining. And normally different unions represent different crafts; thus, on the same railroad, firemen might be represented by the Brotherhood of Firemen and Enginemen, and engineers by the Brotherhood of Locomotive Engineers. Yet seasonal and other factors produce a high degree of job mobility for individual employees in the industry, that is, of shuttling back and forth between crafts. For example, a fireman may be temporarily promoted to engineer for a short time, or a conductor might have to serve temporarily as brakeman. Under the ordinary union-shop contract, such a change from craft to craft, even though temporary, would mean that the employee would either have to belong to two unions—one representing each of his crafts—or would have to shuttle between unions as he shuttles between jobs. The former alternative would, of course, be expensive and sometimes impossible, while the latter would be complicated and might mean loss of seniority and union benefits.[21]

So Congress faced the problem of reconciling the union shop with some protection to employees who shifted from one craft to another one represented by a different labor organization under a union-shop contract.[22] The solution, of course, was evident: to provide that if a fireman, for example, is temporarily promoted to engineer, he can satisfy the union-shop contract of the engineers although still remaining a member of the union representing the firemen.

---

[21] House Hearings, *supra,* at pp. 30–31, 32–33, 35–36, 42–43, 78–81, 126, 192–194; Senate Hearings, *supra,* at pp. 18–19, 67–68, 69, 73, 78–79. See also Levinson, *Union Shop Under the Railway Labor Act,* 6 Labor L. J. 441, 443–448 (1955).

[22] See H. R. Rep. No. 2811, *supra,* at pp. 5–6.

As a result, the Committee reporting the bill to the Senate offered on the Senate floor the following amendment to subsection (a) of Section 2, Eleventh:

> "*Provided further,* That no such [union shop] agreement shall require membership in more than one labor organization." [23]

Senator Hill, manager of the bill, explained the Committee amendment:

> "This proviso was attached because some question was raised as to the status, under this bill, of employees who are temporarily promoted or demoted from one closely related craft or class to another. This practice, with minor exceptions, occurs only among the train- and engine-service employees. Thus a fireman may be promoted to a position as engineer for a short time and then due to a reduction in force be returned to his former position as fireman. It is the intention of this proviso to assure that in the case of such promotion or demotion, as the case may be, the employee involved shall not be deprived of his employment because of his failure or refusal to join the union representing the craft or class in which he is located if he retains his membership in the union representing the craft or class from which he has been transferred." [24]

Due to a temporary adjournment of the Senate, no action was taken on this amendment. When the bill was again taken up, however, a substitute amendment, which had been drafted by the railroad brotherhoods, was offered by Senators Hill and Taft.[25] The language of this substitute was that of the present Section 2,

---

[23] 96 Cong. Rec. 15735.

[24] *Id.,* at 15736.

[25] *Id.,* at 16268.

Eleventh (c), providing that the requirement of membership under a union-shop contract is satisfied if the employee belongs to "any one of the labor organizations, national in scope, organized in accordance with this Act." [26] Senator Hill explained that the purpose of this substitute was the same as that of the previous amendment:

> "[The amendment does] nothing more nor less than what the committee desires to do, and what was the intent of the committee in offering its amendment, that no employee of a railroad should be required to belong to more than one labor organization. The only difference between the committee amendment and the amendments now before the Senate, which have been agreed upon by all the railroad organizations, is that the amendments now before the Senate spell out in much more detail the purposes of the committee amendment than did the committee amendment. But the intent and the purpose . . . are exactly the same." [27]

This amendment passed as introduced [28] and now forms subsection (c).

It thus becomes clear that the only purpose of Section 2, Eleventh (c) was a very narrow one: to prevent compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts.[29] The aim of the Section, which was

---

[26] See n. 13, *supra.*

[27] 96 Cong. Rec. 16268. See also *id.,* at 16261, 16328–16330.

[28] *Id.,* at 16268.

[29] Had Congress wanted to confer blanket "union-shopping" rights on employees, it presumably would have allowed nonmembers of a union to join *any* union (qualified under Section 2, Eleventh) at the time a union-shop agreement was first put into effect. However, the next-to-last proviso of Section 2, Eleventh (c) states that when

drafted by the established unions themselves,[30] quite evidently was not to benefit rising new unions by permitting them to recruit members among employees who are represented by another labor organization. Nor was it intended to provide employees with a general right to join unions other than the designated bargaining representative of their craft, except to meet the narrow problem of intercraft mobility. This is made particularly clear when the provision is taken in the context of American labor relations in general. The National Labor Relations Act contains no parallel to subsection (c), and employees under a union-shop contract governed by that Act must join and maintain membership in the union designated as the bargaining representative or suffer discharge.[31] Similarly, subsection (c) does not apply to *nonoperating* employees, where the problem of seasonal intercraft movement does not exist. Railroad employees

---

a union-shop provision is first signed, employees not belonging to a qualified union may be required to join that union which represents the craft in which they are employed at the time the agreement becomes effective. See n. 13, *supra*. Thus when this agreement between petitioners was first put into effect, Rychlik, had he belonged to no union at all, would have been required to join the Brotherhood specifically, and could not have chosen to join even such competing unions which are concededly national in scope, not to speak of UROC. In other words, this proviso completely negates the argument that the purpose of the statute was to allow employees to *choose* between unions.

[30] See Senator Hill's statement, 96 Cong. Rec. 16329: "The representatives of the railway organizations sat around a table together and worked out the details of the amendment, and then brought it to the Senator from Ohio and the Senator from Alabama, and we saw that the amendment was exactly similar to the committee amendment, except that it spelled out in more detail the safeguards which were deemed necessary in order to properly do the job."

[31] See Levinson, *supra*, n. 21.

such as clerks working under a union-shop contract have no right at all to join a union other than the bargaining representative. In other words, once a union has lawfully established itself for a period of time as the authorized bargaining representative of the employees under a union-shop contract, Congress has never deemed it to be a "right" of employees to choose between membership in it and another competing union. If Congress intended to confer such a right, it would scarcely have denied the right to nonoperating employees of the railroads or industrial employees under the National Labor Relations Act. The purpose of Section 2, Eleventh (c) was simply to solve the problem of intercraft mobility under railroad union-shop contracts.

## II.

There next arises for consideration the manner in which Congress achieved this purpose. Section 2, Eleventh (c) provides that for operating employees a union-shop contract can be satisfied by membership in "any one of the labor organizations, national in scope, organized in accordance with this Act . . . ." At first blush this would appear to confer on employees a blanket right to choose between alternative unions which are, in the abstract, national in scope and organized in accordance with the Act. But when taken in the context of the Railway Labor Act as a whole, it becomes apparent that this language refers to a certain *group* of unions, a group already constituted. For the language was borrowed from Section 3, First of the Act, which had been on the books for some 17 years, and which establishes precisely the same qualifications for those unions which are permitted to elect the labor members of the NRAB. Subsection (a) of Section 3, First provides that unions may become electors if they are "national in scope" and are "organized in accordance

with" the Act.[32] Subsection (f) then spells out an impartial administrative method of tripartite arbitration whereby it can be decided whether a particular union meets these qualifications.[33] In other words, by writing into Section 2, Eleventh (c), standards identical to those of Section 3, Congress in Section 2 was evidently making reference to those unions which had qualified as electors under Section 3 through the administrative procedure there expressly provided.[34] This reference to an already constituted group of unions is emphasized by the fact that Congress in Section 2, Eleventh (c) did not say that an employee under a union-shop contract could join "any" labor organization which was national in scope and organized in accordance with the Act; rather it said that such an employee could join *any one of the* labor organizations which are national in scope and organized in accordance with the Act. In short, Congress in Section 2 was referring to a group of

---

[32] See n. 14, *supra*. The "organized in accordance" language refers to Section 2, Fourth, which prohibits company unions, and which had also been on the books since 1934. 48 Stat. 1187 (1934), 45 U. S. C. § 152, Fourth.

[33] See n. 16, *supra*.

[34] Respondent argues that the standards of Section 3 are not the same as those of Section 2, Eleventh (c), and that therefore the latter provision cannot refer to the unions qualified under the former. He points out that Section 3, First (f) makes it the duty of the board of three to determine whether the claimant union is "organized in accordance with section 2 hereof and is otherwise properly qualified to participate in the selection of the labor members of the Adjustment Board," and argues that the words "otherwise properly qualified" must refer to qualifications not listed in Section 2, Eleventh (c). But we think it clear that these words merely incorporate by reference the qualifications listed in Section 3, First (a) for union electors, and the latter section defines these qualifications in terms identical to the union-shop section. See 69 Harv. L. Rev. 1512, 1514.

unions already defined and constituted under the Section 3 procedures. And therefore an employee has available to him alternative membership only in such unions as have already qualified as electors under Section 3.

### III.

This interpretation of the Act solves the problem which Congress faced without conferring on employees "floating" rights which Congress did not intend to grant. For the problem of intercraft mobility vanishes if the promoted fireman can remain in the firemen's brotherhood, even though his new craft is represented by a different union; and the firemen's brotherhood will, of course, already have qualified under the Act as an elector under Section 3. Furthermore, this interpretation avoids troublesome questions which would arise were we to hold that employees have a right to belong to any union which happens to be national in scope and organized in accordance with the Act. For, while Section 3, First provides an impartial administrative scheme to deal with precisely this question, Section 2, Eleventh (c), assuming it does not refer to an already defined group of unions qualified under Section 3, is silent on the procedure to determine whether a union meets its requirements. An entire new administrative scheme would have to be fashioned by the courts out of thin air to deal with this question, or the courts themselves would have to deal with it without prior administrative action. If System Boards, for example, are to be given jurisdiction to make such determinations, is there to be judicial review? What is to be the scope of such review? How is the inherent bias of the established-union members of these boards to be overcome? Would the determination of one Board (or one Circuit) that such a union as UROC is "national in scope" be binding on another Board or another Circuit?

Moreover, to sanction such a "floating" right in employees would make only for confusion and uncertainty in labor relations in the railroad industry. No employee could with safety join an alternative union, for he could not know until after-the-fact adjudication whether that union meets the requirements of Section 2. On the other hand, interpreting Section 2 to refer to those unions which have already qualified as electors under Section 3 means that an employee will always know or can easily ascertain the unions which he can join as an alternative to his bargaining representative. A new union, such as UROC, could make itself available for such alternative membership by seeking certification as an elector through the impartial procedure of Section 3, First (f). And the decision of the "board of three" provided by that Section would be prospective, uniform throughout the nation, and would be the ruling of an administrative body established to deal with precisely this question.

We hold, therefore, that Section 2, Eleventh (c) of the Act makes only such unions available for alternative membership under a union-shop contract, such as this one, as have already qualified as electors for the labor members of the NRAB under Section 3, First. Since UROC has not so qualified, respondent has not stated a claim on which relief can be granted. The decision below must therefore be reversed and the case remanded to the District Court with instructions to dismiss the complaint.

*Reversed and remanded.*

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, concurring.

The decision below, if allowed to stand, would tend to dislocate the scheme that Congress has seen fit to devise for the regulation of industrial relations on railroads, and

so I join in reversing the judgment. But I get there by a different route from the Court's. In my view of the Railway Labor Act, the District Court had no jurisdiction of this action and the complaint should be dismissed for want of it, not on the merits.

The governing outlook for construing the Railway Labor Act is hospitable realization of the fact that it is primarily an instrument of industrial government for railroading by the industry itself, through the concentrated agencies of railroad executives and the railroad unions. (For details, see the dissenting opinions in *Elgin, Joliet & Eastern R. Co.* v. *Burley,* 325 U. S. 711, 749; 327 U. S. 661, 667.) The dominant inference that the Court has drawn from this fact is exclusion of the courts from this process of collaborative self-government. See, *e. g., General Committee* v. *Missouri-Kansas-Texas R. Co.,* 320 U. S. 323; *Order of Railway Conductors* v. *Pitney,* 326 U. S. 561; *Slocum* v. *Delaware, Lackawanna & Western R. Co.,* 339 U. S. 239. Neither *Moore* v. *Illinois Central R. Co.,* 312 U. S. 630, nor *Order of Railway Conductors* v. *Swan,* 329 U. S. 520, is fairly to be deemed an exception to the general principle and, in any event, those cases involve circumstances not relevant to the present situation.

There is one qualification to the principle I have stated, or, rather, there is a counter-principle to be respected. This is the doctrine established by *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192. The short of it is that since every railroad employee is represented by union agents who sit on a System Board of Adjustment, such representatives are in what amounts to a fiduciary position: they must not exercise their power in an arbitrary way against some minority interest. The fact of a general conflict of interest between a minority of union members and representatives designated by the majority does not of itself vitiate the presupposition of self-government and

does not of itself subject the System Board action to judicial review. Conflict between a majority and a minority is a commonplace in the whole collective bargaining process. But the bargaining representatives owe a judicially enforceable duty of fairness to all the components of the working force when a specific claim is in controversy.

The determination of the System Board on the merits is not open to judicial review, even on so-called legal questions. It is not for a court to say that a complaint against the System Board must fail because the System Board rightly held against the complainant. Right or wrong, a court has no jurisdiction to review what the System Board did, unless a complainant asserts arbitrariness and seeks to enforce the limited protection established in the *Steele* case. It is not for a court to decide as an abstract issue what procedure a union must or may pursue to establish its status as an organization "national in scope," within § 2, Eleventh (c) of the Railway Labor Act, nor whether or when an individual claiming through such a rival union may assert its claim for his benefit. (As bearing on the legal complexities raised by such interrelationship between a member and an organization, see the opinion of Mr. Justice Jackson in *Joint Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 183.)

For Rychlik to have brought himself within the *Steele* case it would have been necessary to charge that the System Board had made its determination arbitrarily and that on the basis of this arbitrary determination he had been discharged. On such a claim, and only on such a claim, would he have been entitled to judicial relief. In the absence of such a claim, the District Court was without jurisdiction to entertain the complaint.