Peter J. STRUSKI

v.

**PENN CENTRAL COMPANY**

and

**Brotherhood of Locomotive Firemen and Enginemen by W. B. Woodward, Jr., Trustee ad litem**

and

The Pennsylvania Railroad—Baltimore & Eastern Railroad—Brotherhood of Locomotive Firemen and Enginemen—System Board of Adjustment by D. L. Moore, S. L. Zane, N. H. Nelsen and J. W. Price, Trustees ad litem.

**Civ. A. No. 33135.**

United States District Court
E. D. Pennsylvania.

Jan. 17, 1969.

Herbert G. Schick, MacCoy, Evans & Lewis, Philadelphia, Pa., Richard H. Kraushaar, Cleveland, Ohio, for plaintiff.

Robert M. Landis, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant Penn Cent. Co.

L. Carter Anderson, Rawle & Henderson, Philadelphia, Pa., and Donald Bennett, Cleveland, Ohio, for Brotherhood of Locomotive Firemen.

H. Thomas Felix, II, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for System Board of Adjustment.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

WOOD, District Judge.

This is an action in equity removed from the state courts and seeking to abrogate a decision of the Railway Labor Act System Board of Adjustment that terminated plaintiff's employment as an engineman with the railroad. Plaintiff requests an injunction against enforcement of the System Board's decision, an order directing that the plaintiff's Railway personnel record be cleared, and an award for lost wages. We have decided that Mr. Struski should be reinstated and his seniority record cleared, but that he is not entitled to any damages. We have made the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Mr. Peter J. Struski, the plaintiff in this action, was first employed by the Pennsylvania Railroad as a fireman on or about June 15, 1948. (N.T. 18) He was promoted from fireman to engineer in September 1957, but never worked as an engineer because his seniority did not qualify him for it. (N.T. 19)

2. The defendant, Penn Central Transportation Company ("Railroad") is a corporation incorporated under the laws of Pennsylvania and engaged in business as a railroad carrier. (N.T. 12)

3. The Brotherhood of Locomotive Firemen and Enginemen ("Firemen") is a labor union organized in accordance with the Railway Labor Act, 45 U.S.C.A. Section 151 et seq., and representing the employees of the Railroad in engine service, including the craft of firemen. (N.T. 13)

4. The Brotherhood of Locomotive Engineers ("Engineers") is a labor union national in scope and also organized in accordance with the Railway Labor Act. (N.T. 14)

5. On June 15, 1954, the Railroad entered into a union shop agreement with the Firemen as provided for in Section 2(11) of the Railway Labor Act,

45 U.S.C.A. § 152(11). This agreement was in effect during the period which this litigation is concerned with. (N.T. 15)

6. The Pennsylvania Railroad, Baltimore & Eastern Railroad-Brotherhood of Locomotive Firemen and Enginemen-System Board of Adjustment ("System Board") is organized pursuant to the union shop agreement dated June 15, 1954 between the Railroad and the Firemen. (N.T. 13) It is comprised of two representatives of the Firemen and two representatives of the Railroad. (N.T. 61–2)

7. Mr. Struski paid dues and was a member in good standing of the Firemen through January 1957. (N.T. 28) In February of 1957, he decided that he preferred to be a member of the Engineers union. He ceased paying dues to the Firemen and began paying dues to the Engineers. He was a member in good standing of the Engineers as of February 1957, and remained a member thereafter. (N.T. 28, 98–111, 115–16)

8. On or about June 3, 1957, Mr. Struski received a letter from Mr. P. N. Mansfield, Superintendent of Transportation, stating that for failure to pay dues to the Firemen, Mr. Struski was in violation of the union shop agreement, (N.T. 22–3) and stated to him:

"You are, therefore, advised that as provided in Section 5(c) of the Union Shop Agreement of June 15, 1954, amended effective November 1, 1955, your seniority and employment in the crafts or classes represented by the Brotherhood of Locomotive Firemen and Enginemen shall be terminated ten days from the date of this letter, unless the attached notice is withdrawn by the Brotherhood in the interim or unless you request a hearing in the manner set forth below." (N.T. 23, Ex. P–1)

9. Mr. Struski promptly sent the following reply to Mr. Mansfield:

"In reply to your letter dated June 3, advising me that I have failed to comply with the Union Membership Agreement. I have in my possession Receipts from the B of LEF up to and including January '57 and then receipts from the B of LE, Division 565, for the month of February and the months thereafter.

"I therefore request a hearing on the above matter unless notice is withdrawn by the Brotherhood.

"So will you kindly inform me as to my status before the ten days expire so I can let my Brotherhood handle my case?" (N.T. 23–6; Ex. P–2)

10. Mr. Struski did not receive the prompt answer which he requested. (N. T. 26)

11. The next communication Mr. Struski received from the Systems Board was on January 31, 1959. This was a formal notice of hearing of his case to be held in Philadelphia. (N.T. 29–30, 38)

12. The meeting of the Systems Board which considered Mr. Struski's case was held on February 9, 1959. (N. T. 69) Mr. Struski did not appear at this meeting.

13. The Clerk of the Systems Board did not know of any information before the Board concerning Mr. Struski's case than Mr. Struski's letter in June 1957 requesting a hearing. (N.T. 69–76)

14. Mr. Turk, a representative of the Firemens Union on the Systems Board made a motion that since Mr. Struski failed to appear at the hearing the Board assumed that he waived his right to a hearing and should render its decision based on information that was available at the time which decision should be as follows:

"DECISION: Peter J. Struski has not complied with the membership requirements for continued employment as set forth in the Union Shop Agreement, effective July 1, 1954, amended November 1, 1955.

"The motion was seconded by Mr. Moore, ballots were spread, which resulted as follows:

"For the motion 4—against the motion—0." (N.T. 75)

15. At the time of the meeting of the Systems Board, Mr. Struski was on furlough from his employment with the Railroad. (N.T. 29) He was informed by letter dated February 9, 1959, that his employment had been terminated. (N.T. 30)

16. Sometime thereafter, Mr. Struski contacted a Mr. Blanton, the Chairman of Local 565 of the Engineers Union. Mr. Blanton wrote a letter to the Systems Board in Mr. Struski's behalf stating *inter alia* that Mr. Struski was a member in good standing of the Engineers Union, and that it was unfair to take advantage of Mr. Struski and cite him for a hearing while he was furloughed. He requested that Mr. Struski be returned to service in good standing. (N.T. 77-9)

17. This letter was received by the Systems Board and copies sent to Board members for their consideration. (N.T. 79)

18. Subsequently, Mr. Blanton referred Mr. Struski's case to legal representatives of the Engineers in Cleveland. (N.T. 31)

19. A letter dated January 11, 1961, was sent from Mr. G. L. Buuck, General Chairman of the Brotherhood of Locomotive Engineers, to Mr. Herman Kendall, Manager-Labor Relations, Pennsylvania Railroad, stating that the

"* * * General Committee of Adjustment has turned this matter over to the Grand Office of the Brotherhood of Locomotive Engineers and its Legal Department for further handling.

"You will no doubt hear from our Legal Department in Cleveland within the next few days." (N.T. 97)

20. Thereafter, the following letter dated February 3, 1961, was sent to the Firemens Union by H. F. Hempy, the Grand Secretary of the Engineers Union:

"This is to certify that according to the records of this Organization Peter J. Struski has held continuous membership in Division 565 since February 1, 1957." (N.T. 85-6, 92)

21. Several other letters were also sent to the Systems Board on Mr. Struski's behalf, and a reconsideration of Mr. Struski's case was requested. The Systems Board did not convene formally to determine whether to reconsider Mr. Struski's case. The Clerk of the Systems Board communicated with each of the members and received authorization to send the following letter to Mr. Struski's legal representatives from the Engineer's Union:

"In view of the circumstances, the Board cannot reconsider Mr. Struski's case and the papers referred to the Board by Mr. Kendall are being returned to him." (N.T. 80-3)

22. Mr. Struski still pays dues to, and is a member in good standing of, the Engineers Union. (N.T. 52)

23. From the time of the termination of his employment with the Railroad until February 1962, Mr. Struski earned somewhat less than $70.00 per week for performing several different occasional jobs. (N.T. 36)

24. Since February 2, 1962, Mr. Struski has been employed as an assembler for North American-Rockwell Corporation in Ashtabula, Ohio. From the date of his employment with North American in February 1962 through 1965, Mr. Struski was paid approximately $7,000.00 per year. (N.T. 36) In 1966 he was paid exactly $9,238.53. (N.T. 35; Ex. P-5) In 1967 he was paid exactly $7,745.94. (N.T. 35; Ex. P-6)

25. The employee of the Penn Central Company immediately above the plaintiff on the Seniority Roster of Enginemen, Firemen and Hostlers, revised January 1, 1959, and posted May 15, 1959; was J. F. Wilson, employee No. E-255, with seniority date as fireman June 15, 1948 and seniority date as engineman September 3, 1957. (Stipulation)

26. The employee of the Penn Central Company immediately below the plaintiff on the Seniority Roster of Enginemen, Firemen, and Hostlers, revised January 1, 1959, was G. J. Vivacqua, employee No. E-227, with seniority date

as fireman August 2, 1948 and no seniority as engineman. (Stipulation)

27. The gross wages paid by the Penn Central Company to J. F. Wilson from 1959 to 1968, inclusive, were as follows:

| Year | Gross Wages Paid |
|---|---|
| 1959 [1] | $ 2,321.62 |
| 1960 | 4,380.66 |
| 1961 | 1,843.36 |
| 1962 | 3,451.78 |
| 1963 | 6,098.39 |
| 1964 | 7,447.23 |
| 1965 | 9,705.22 |
| 1966 | 10,823.16 |
| 1967 | 10,941.12 |
| 1968 [2] | 8,344.39 |
| Total | $65,356.93 |

(Stipulation)

28. The gross wages paid by the Penn Central Company to G. J. Vivacqua from 1959 to 1968, inclusive, were as follows:

| Year | Gross Wages Paid |
|---|---|
| 1959 [3] | $ 1,954.33 |
| 1960 | 2,976.71 |
| 1961 | 1,048.01 |
| 1962 | 2,718.78 |
| 1963 | 4,258.04 |
| 1964 | 5,615.89 |
| 1965 | 6,985.85 |
| 1966 | 9,516.59 |
| 1967 | 6,477.96 |
| 1968 [4] | 4,540.59 |
| Total | $46,092.75 |

(Stipulation of counsel)

## DISCUSSION

At an earlier stage of this case, two of the defendants filed motions for summary judgment on the ground that this Court had no jurisdiction to review the finding of the Systems Board. Plaintiff made two arguments in resisting this motion: First, that the proceedings before the Systems Board were so tainted by discrimination against plaintiff and active opposition against him by the Firemen so as to give the court jurisdiction to review the case on the merits;

See, e. g. Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), Steele v. Louisville & Nashville Railroad, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), Cunningham v. Erie Railroad Company, 266 F.2d 411 (2nd Cir. 1959), and second, that the decision of the Systems Board should be reviewable because the Board lacked jurisdiction, and because the decision of the Board was not of the kind which are made final and binding under the Railway Labor Act. Judge Kirkpatrick accepted in substance the plaintiff's first argument as sufficient to deny the defendant's motion. He concluded that "the complaint states that the Board's decision and its refusal to reconsider it were 'grossly discriminatory' and 'arbitrary in the extreme.' He [the plaintiff] is entitled to prove that if he can."

Subsequent to that ruling, the Third Circuit handed down its opinion in a similar case, Brady v. Trans World Airlines, Inc., 401 F.2d 87 (1968), which in substance adopted the second argument which plaintiff had urged in resisting defendant's motion for summary judgment. Brady involved, as does this case, the discharge of an employee after a Systems Board had cited him for failure to pay back union dues. The employer and the union to which the employee had allegedly failed to pay dues challenged the subject matter jurisdiction of the District Court. They contended that pursuant to the Railway Labor Act, 45 U.S.C. § 184 and their collective bargaining agreement established a Systems Board of Adjustment to adjust and decide disputes or grievances arising out of the interpretation and application of the agreement. The agreement provided that in cases properly before the Board, its decision would be final and binding. Several cases were cited upholding the finality of adjustment board decisions e. g. Gunther v. San Diego A. E. R. Co., 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965).

1. From June 1.

2. To and including August 1968.

3. From June 1.

4. To and including August 1968.

The Circuit Court affirmed the holding of the District Court that it had jurisdiction over the subject matter of the action because the complaint alleged "hostile discrimination" [i. e. of the Board toward Brady] and of violations of Mr. Brady's rights under section 2 (Fourth) (Eleventh) of the Railway Labor Act. The Circuit Court, citing Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), held that adjustment (or System) boards were conceived to settle disputes between employees and their employers, but that it was without jurisdiction to arbitrate disputes between employees and their bargaining representatives. It quoted with approval the conclusion of the District Court that "it is simply repugnant to our standards of fundamental fairness and totally unrealistic to require an employee to submit a dispute he has with his bargaining agent for final determination to persons selected by and representing the bargaining agent." 167 F.Supp. 469, at 472.

The Circuit Court then stated that the District Court had properly found that Brady's complaint alleging violations of Section 2 (Fourth) (Eleventh) pleaded causes of action involving Federal jurisdiction under 28 U.S.C. §§ 1331, 1337. With regard to the allegation of hostile discrimination, the Court stated that:

"In a suit alleging hostile discrimination violative of the bargaining representatives duty of fair representation, it must be proved not only that the union's actions were improper, but that they were undertaken with malice and bad faith."

■ We therefore take these as the standards by which we should resolve the instant case. Under 45 U.S.C. § 152 (eleventh) (a) a railroad may agree with a labor organization national in scope and organized in accordance with the Railway Labor Act that as a condition of continued employment all employees shall become members of the labor organization representing their craft. However, § 152(c) [5] provided that the union shop requirement might be met by membership in any of the labor organizations national in scope and in accordance with the Railway Labor Act. It was further provided in § 152 (eleventh) (c) that "nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services." These statutory provisions are complemented by Section 2(c) of the Union Shop Agreement between the Railroad and the Firemen's Union of July 1, 1954, as amended November 1, 1955, which states in relevant part that "nothing contained in this agreement shall prevent an employee from changing membership from one labor organization to another labor organization. * * *" It is not disputed in this case that the Enginemen's union is such another labor organization "national in scope," to which Struski was entitled to switch his membership under these provisions.

■■ We think that the purpose of 2 (eleventh) (c) was to insure that an employee was not required to be a member of more than one labor organization in order to satisfy the union shop requirement of the collective bargaining agreements authorized by Subsection (a). While it was not intended to confer a general "floating" right to employees to join *any* other union, "national in scope", it was intended that employees should not

5. 45 U.S.C. § 153, subd. 1(f) provides a procedure "In the event a dispute arises as to the right of any national labor organization to participate as per paragraph (c) [i. e. 2 (eleventh) (c)] of this section in the selection and designation of the labor members of the Adjustment Board * * *." In such a case this court would not have jurisdiction until prior resort had been taken to the procedure there established. There is not such a dispute here, however, and we take jurisdiction to determine rights under section 2 (eleventh) pursuant to 28 U.S.C. §§ 1331, 1337 as previously discussed. See Brady v. Trans World Airlines, Inc., supra., 401 F.2d at 95 fn. 27; Pennsylvania R. R. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480 (1957).

be hindered in switching to another union, national in scope, that was certified in accordance with the procedure prescribed by 45 U.S.C. § 153, subd. 1(f). In that way an employee could know in advance which unions he can join as an alternative to his present bargaining representative. See Pennsylvania Railroad Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480 (1957).

Therefore, by statute and by the Firemen's agreement with the Railroad, Struski was entitled to switch his membership from the Firemen's Union to the Engineer's Union.[6] The question for our determination here thus becomes whether as a matter of fact Mr. Struski terminated his membership in the Firemen and became a member of the Engineers as of February 1958, and therefore whether the Firemen and the Railroad acted correctly in stripping Mr. Struski of his seniority and terminating his employment.

■ The defendants argue that the decision of the Systems Board and thus the action of the Union and the Railroad was correct because, they assert, Mr. Struski was not a member of the Engineers Union in May 1957 when he was first cited by the Firemen for noncompliance with the Union Shop Agreement. Although it was the position of the Engineers Union in petitioning the Firemens Systems Board and in this litigation that Mr. Struski was a member in good standing of the Engineers commencing in February 1957, the defendants here argue that the Engineers retroactively "waived" a number of technicalities in their constitution and by-laws in order to assist one of their brothers who had attempted to switch to their union from the competing Firemen's Union.

We do not think, however, that the Railroad and the Firemen should be able to raise such technicalities which are of internal significance only to the Enginemens Union. The responsible officer of the engineers, its Secretary-Treasurer Mr. Systma, testified that as far as he was concerned, Mr. Struski had paid his

dues, satisfied necessary internal procedures, and was a member of the Engineers Union as of February 1957. (N.T. 111) Mr. Systma further testified (N.T. 115) that the Engineers took the position that Mr. Struski had made an application in good faith, paid his dues on time, and run afoul of a technicality, but that this did not hinder his becoming a member of the Engineers Union. The testimony further shows that this position was adopted by Mr. Blanton, the local chairman of the Engineers, when he first contacted the Systems Board, long before it became apparent that the actual effective date of Mr. Struski's membership in the Engineers would be a pivotal question in this litigation. We therefore conclude that Mr. Struski was a member of the Engineers Union as of February 1957.

The defendants have also argued that although Section 2(c) of the Firemens Union Shop Agreement with the railroad provided that an employee could switch his membership to another union and thereby be excluded from the union membership requirement in Section 1, Section 2(c) does not excuse the employee from the citation and hearing procedures of Sections 4, 5, and 7. They contend that without the Systems Board procedure, no means exists by which a railway labor union representing employees can determine whether an employee has in fact become a member of another national labor union national in scope. In addition, it is urged, citing Producers Transport, Inc. v. N.L.R.B., 284 F.2d 438 (1960), that the burden of paying membership dues is upon the employee, that in view of Mr. Struski's default to appear at the Board's hearing, the Board was justified in treating the statement in Struski's letter of June 4, 1957 as no more than an excuse given to delay the imposition of the penalty of being discharged as prescribed by the terms of the union shop agreement for violating its membership requirements. The defendants also urge us that in any event Mr. Struski is guilty of laches in pressing his

---

6. Mr. Struski acquired seniority as an engineer on September 24, 1957.

claim for reinstatement after the February 1959 decision of the Systems Board because after Mr. Blanton's letter of that month urging reinstatement, the Systems Board heard nothing more from Mr. Struski's representatives until January 1961.

We do not agree with these assertions for a number of reasons. *Brady*, supra, stated that Systems Boards were without jurisdiction to decide disputes between an employee and the union in cases of alleged failure to pay dues in accord with the union shop agreement. This was because of the strong possibility in such cases that the union's interest would conflict with the interest of the employee whom they were supposed to represent. It was recognized that "healthy industrial relations cannot be preserved if unions are prevented from effective action to secure the prompt payment of dues where dues are required under a valid union security agreement and that a necessary concomitant of such effective action by a union is the responsibility of the employee that his dues are paid promptly when due." However, it was added that "a delicate balance must be maintained between the union's right to preserve its own institutional existence and its sensitive obligations for fair dealing to its members under circumstances as are presented in this case." 401 F.2d 87 at 99.

■ Especially in cases like the instant one where two unions are in vigorous competition with each other, there is a great danger that Systems Boards might be less than scrupulous in rendering an innocent employee desiring to switch unions the "maximum of good faith and fair dealing" owing him when his livelihood is at stake. 401 F.2d 87 at 99. We think that in this case Mr. Struski did not receive that maximum of good faith and fair dealing. Upon receiving the letter of June 3, 1957, threatening to terminate his employment and seniority, Mr. Struski (who unlike Mr.

Brady was not knowledgeable in appeal procedure) asked for a hearing and concluded with a request for the Systems Board to "kindly inform me as to my status before the ten days expire so that I can let my Brotherhood handle my case?" This request was not answered. Then, approximately a year-and-a-half later, while Mr. Struski was on furlough and living some distance outside of Philadelphia, the Systems Board summoned him to Philadelphia for a hearing several days later. Mr. Struski, who by that time had been a member of the Engineers for about two years, may well have simply concluded that he was now an Engineman and the Firemen had no jurisdiction over him. But even after the default of appearance, when the Engineers communicated to the Systems Board that Mr. Struski had been a member since February 1957, the Board did not even meet to reconsider his case, thereby summarily depriving him of his livelihood.

We think that, with Mr. Struski's job at stake the Firemen should have been more sensitive to his rights than it was. Rather than calling him away from his home, they might have asked for written certification of his membership from his Engineers local; indeed had this been requested when Mr. Struski asked to be apprised of his rights in June 1957, this unfortunate train of litigation might have been averted.

Under § 152 (eleventh) (a), Mr. Struski's membership could only be terminated if he neglected to pay dues to the union, national in scope of which he was a member. Under § 152 (eleventh) (c) and the bargaining agreement between the Firemen and the Railroad, Mr. Struski was entitled to switch membership from the Firemens to the Engineers Union, as long as he properly tendered dues to the union of which he was a member. Under the circumstances of this case, he is therefore entitled to reinstatement and restoration of seniority.[7]

7. Because we find in favor of Mr. Struski on this ground, we do not decide his claim of hostile discrimination by the Board.

We cannot, however, award any damages to Mr. Struski. We permitted plaintiff's counsel to submit a stipulation after trial which enumerated the payroll history of the employees of the Railroad immediately above and immediately below where Mr. Struski would have been on the seniority roster had his seniority not been terminated. The apparent suggestion was that if we found that Mr. Struski was wrongfully discharged, we could average the earnings of the two remaining employees and consider that average as what he would have earned had he not been discharged (with, of course a proper discounting for wages earned in other employment to mitigate his damages). Counsel for the defendant objected to the admission or use of these statistics on the ground that such a method of computing what Mr. Struski would have earned would be unduly speculative. It was argued that Mr. Struski's testimony as to wages earned between 1959 and 1965 was indefinite,[8] and that Mr. Struski had testified that work assignments for employees are always a matter of personal preference according to the employees' willingness to accept assignments at distant job locations (N.T. 51), and that therefore comparison with employees of comparable seniority is not meaningful. This would seem the logical inference from the wide year-to-year variations in salary of Wilson and Vivacqua in our findings of fact.

We are inclined to agree with the defendants. However, we do not reach that question because even accepting the plaintiff's theory, Mr. Struski would not be entitled to any damages. The employee above him on the seniority rolls earned $65,356.93 over the ten-year period; the employee below him earned $46,092.75 over the ten-year period. Accepting Mr. Struski's representations as to his earnings, his total for the ten-year period is approximately $59,500.00. This is approximately $4,000.00 in excess of the average of the other two employees' earnings.

Accordingly, we make the following conclusions of law:

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action.

2. Mr. Struski was wrongfully discharged from his employment and is entitled to reinstatement with full seniority by the defendant Railroad, and IT IS SO ORDERED.

3. Mr. Struski is not entitled to damages.

---

8. Mr. Struski brought with him his withholding statement for 1966 and 1967. But for the years 1962 to 1965 he testified that "I don't remember the exact figures, but I would say it was right in around $7,000 a year." (N.T. 36) As to his employment from the time he was discharged by Penn Central until employment by Rockwell-Standard in 1962 he testified that he had taken odd jobs and earned about $70 per week.