**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, a National Railway Labor Organization, Appellant,**

v.

**NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, Appellee.**

No. 16269.

United States Court of Appeals
Eighth Circuit.

Jan. 26, 1960.

Richard W. Johnson, Minneapolis, Minn., for appellant.

Earl F. Requa, St. Paul, Minn., for appellee.

Before SANBORN, VAN OOSTERHOUT and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This action, brought pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. § 2201, arises as an actual controversy concerning Section 2, Eleventh of the Railway Labor Act, 45 U.S.C.A. § 152, Eleventh. Judgment for the defendant was entered as directed by the District Court's opinion, 169 F.Supp. 411, and this appeal followed.

Plaintiff, Brotherhood of Locomotive Firemen and Enginemen, appellant here, is a national railway labor organization, organized in accordance with the Railway Labor Act, 45 U.S.C.A. § 151 et seq., (hereinafter sometimes referred to as "the Act") and is the duly designated representative, for collective bar-

gaining purposes, of the locomotive firemen's crafts employed by the defendant carrier. Defendant, Northern Pacific Railway Company, is a Wisconsin corporation and "a carrier by railroad, subject to the Interstate Commerce Act," within the meaning of Section 1, First of the Railway Labor Act, 45 U.S.C.A. § 151, First.

The facts are stipulated. On March 17, 1954, the parties, pursuant to the power granted them by Section 2, Eleventh (a) of the Act, made a Union Membership (or union shop) Agreement and later, on June 27, 1955, pursuant to the power granted them by Section 2, Eleventh (b) of the Act, made a Dues Deduction Agreement, effective July 1, 1955. A number of the carrier's employees, being engaged in the firemen's craft and being members of the Brotherhood, then executed in the Brotherhood's favor written dues assignments of the kind contemplated by the Dues Deduction Agreement. These were duly furnished to the carrier. Thereafter, on or about January 25, 1956, *within* one year, one of these employees, although continuing his employment with the carrier, changed his union membership from that in the Brotherhood to that in another qualified labor organization [1] admitting members of the crafts for which the Brotherhood is the accredited representative for collective bargaining purposes. Upon receiving notification of this, the defendant carrier refused to continue to deduct from this employee's wages the monthly dues which the Dues Deduction Agreement otherwise called for and which the Brotherhood now claims are owing to it.[2]

The carrier claims that it could not, under the Act, continue to collect dues by the checkoff from this employee and that if it did it would be in violation of the Act. The Brotherhood claims that the dues assignment, once given in the manner required by the Act, can be revoked only by a written notice *after* the expiration of one year, that the carrier's failure to continue the dues deduction adversely affects the Brotherhood's rights under the Act, and that the carrier is obligated under the Act and, contractually, under the Dues Deduction Agreement to collect the employee's dues for at least the full one year period. It is this conflict of position between the Brotherhood and the carrier which creates the controversy here.

The record does not enlighten us as to whether the employee, in fact, gave any written notice of revocation to the Brotherhood. No point is raised by either of the parties concerning this question of written notice and we make no point of it here. Henneford v. Northern Pacific Railway Co., 303 U.S. 17, 19, 58 S.Ct. 415, 82 L.Ed. 619; United States v. Van Dusen, 8 Cir., 78 F.2d 121, 122; Drake v. General Finance Corporation of Louisiana, Inc., 5 Cir., 119 F.2d 588, 589, 590; 3 Am.Jur., Appeal and Error, Sec. 568, p. 211; 4A C.J.S. Appeal and Error § 680.

The issue is a narrow one and, while it is made close by certain language in recent opinions, we find ourselves in agreement with the trial court and therefore affirm.

The Railway Labor Act is but one of a series of federal statutes [3] dealing with

---

1. As used in this opinion, the term "qualified labor organization" or "qualified union" means one available to an employee for alternative membership under Section 2, Eleventh (c) of the Act, as interpreted by the Supreme Court in Pennsylvania Railroad Co. v. Rychlick, infra, that is, one not only "national in scope" and organized in accordance with the Act and "admitting to membership employees of a craft or class in any of" the operating services, but, also, one eligible to participate, under Section 3, First of the Act,

45 U.S.C.A. § 153, First, in the election of labor representatives on the National Railroad Adjustment Board.

2. The Brotherhood does not challenge or object to this employee's change of union membership and concedes that the change was one permitted by the Union Membership Agreement and by Section 2, Eleventh (c) of the Act.

3. Mr. Justice Frankfurter, concurring in Railway Employee's Department v. Hanson, 351 U.S. 225, 239, 76 S.Ct. 714,

problems of industrial relations in the functioning of interstate railroads. In its original form, it became effective May 20, 1926, as c. 347, 44 Stat. 577. It was substantially rewritten in 1934, c. 426, 48 Stat. 926; c. 691, 48 Stat. 1185, and was further amended thereafter, but until 1951 it did not permit union shop contracts or checkoffs in the industry. Section 2, Fourth and Fifth. This Congressional policy was reversed with the enactment on January 10, 1951, of c. 1220, 64 Stat. 1238. It is this section which permits agreements for the union shop and for the checkoff. So far as pertinent here, Section 2, Eleventh reads:

"Eleventh. Notwithstanding any other provisions of this Act * * * any carrier or carriers as defined in this Act and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this Act shall be permitted—

"(a) To make agreements, requiring as a condition of continued employment, that * * * all employees shall become members of the labor organization representing their craft or class: * * *

"(b) To make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership: *Provided*. That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation

fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner.

"(c) The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service * * * if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this Act and admitting to membership employees of a craft or class in any of said services; and no agreement made pursuant to subsection (b) of this paragraph shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: *Provided, however,* That as to an employee in any of said services on a particular carrier at the effective date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: *Provided, further,* That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to member-

722, 100 L.Ed. 1112, has described these as constituting "a body of empiric responses by Congress to new problems or new insight for dealing with old prob-

lems." See also State of California v. Taylor, 353 U.S. 553, 557, 77 S.Ct. 1037, 1040, 1 L.Ed.2d 1034.

ship employees of a craft or class in any of said services.

"(d) Any provisions in paragraphs Fourth and Fifth of section 2 of this Act, in conflict herewith are to the extent of such conflict amended."

The parties' 1955 Dues Deduction Agreement follows generally this quoted language of the Act.[4]

Three provisions of Section 2, Eleventh appear to have particular pertinency here. The first is that part of Eleventh (b) which permits the union and the carrier to make an agreement for the deduction by the carrier from the wages of its employees, and for the "payment to the labor organization representing the craft or class of such employees, of any periodic dues, * * *." The second is that part of Eleventh (c) which states that no agreement made pursuant to Eleventh (b) "shall provide for deductions from" the employee's "wages for periodic dues, * * * payable to any labor organization other than that in which he holds membership * * *." The third is the second and last proviso of Eleventh (c) which states that nothing in the statute or in any such agreement "shall prevent an employee from changing membership" from one qualified labor organization to another.

 It would seem, therefore, to follow, logically and simply, from these three provisions of Section 2, Eleventh of the Act, a paragraph which was added to the Act in its entirety and at one time by the 1951 legislation, that:

1. Under the phrase of (b) quoted above, any dues which are properly withheld pursuant to an appropriate Dues Deduction Agreement must be paid to, and can be paid only to, the labor organization representing the craft or class of employees. That labor organization here is the appellant Brotherhood. Switchmen's Union of North America v. Southern Pacific Co., 9 Cir., 253 F.2d 81, certiorari denied, 358 U.S. 818, 79 S. Ct. 29, 3 L.Ed.2d 60; petition for rehearing denied, 358 U.S. 896, 79 S. Ct. 152, 3 L.Ed.2d 123, supports this conclusion, for there the court said, at page 84 of 253 F.2d:

"We think that in making the dues check-off agreement with the Trainmen applicable to the yardmen for whom the Switchmen's Union was the exclusive representative, the Carrier violated its obligation to bargain exclusively with the Switchmen's Union as to all matters pertaining to yardmen."

2. Under that phrase of (c) first quoted above, no dues deduction agreement may provide for payment of checked off amounts to a labor organization other than the one in

4. Section 1 of that Agreement reads in part as follows:

"Subject to the terms and conditions of this agreement, the Carrier shall periodically deduct from the wages of the employes subject to this agreement, who acquire or maintain membership in the Brotherhood, amounts equal to the periodic dues, initiation fees, assessments and insurance premiums (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership in the Brotherhood and shall pay the amount so deducted to the Financial Secretary of each Local Lodge of the Brotherhood; provided, however, that this requirement shall not be effective with respect to any individual employe until he shall have furnished the Carrier with a written wage assignment authorization to the Brotherhood of such mem-

bership dues, initiation fees, assessments and insurance premiums, which wage assignment authorization shall be revocable in writing after the expiration of one year from the date of its execution, or upon the termination of this agreement, or upon the termination of the current Agreement between the Northern Pacific Railway Company and the Brotherhood of Locomotive Firemen and Enginemen entitled 'Schedule for Locomotive Firemen and Hostlers', whichever occurs sooner.

"The wage assignment authorization shall be in the form attached hereto and identified as Attachment 'A' which by this reference is made a part hereof.

"The revocation of the wage assignment authorization shall be in the form attached hereto and identified as Attachment 'B' which by this reference is made a part hereof * * *"

which the employee holds membership.

3. Under the phrase of (c) last quoted above, the employee has freedom, so far as the statute and the agreement between the union and the carrier are concerned, to change his membership from one qualified labor *organization* to another.

4. Taking these three parts of Section 2, Eleventh together, they must mean that if there is to be a checkoff at all, three conditions must be met:

a. The checkoff must be pursuant to an agreement with the bargaining representative which, here, is the Brotherhood;

b. Payment can be made only to that representative, and to no other; and

c. The employee must then be holding membership in that representative.

If any one of these three conditions is not met, there can be no deduction. Further, because the employee has the right to change his membership among qualified labor organizations, he has, in effect, the power to terminate the checkoff in his case, for *nothing*, says the statute, shall prevent the membership change and, once it is changed, the third of the three conditions is not met. The one year provision as to irrevocability of a written dues assignment, once executed, then necessarily is subordinate to these other provisions and is defeated by an allowable membership change; the one year provision, therefore, can have application only to the situation where the employee's membership in the qualified labor organization, in favor of which he has executed the dues assignment, continues throughout the one year period. This, in fact is the holding of the trial court, at page 415 of 169 F.Supp.

 This interpretation of Section 2, Eleventh, it appears to us, is not only logical and simple but is also necessary and inevitable. It follows from and gives full effect to accepted principles of statutory construction. Courts should, if possible, heed the intention and purpose of Congress in enacting legislation. Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199; 82 C.J.S. Statutes § 321; 50 Am.Jur. Statutes, Sec. 303. They should avoid giving a statute any other construction than that which its words demand. 50 Am.Jur., Statutes, Sec. 225, p. 207. And, " * * * if possible, effect shall be given to every clause and part of a statute." D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704; 82 C.J.S. Statutes § 346; 50 Am.Jur. Statutes, Secs. 352 and 358, where it is said, p. 350:

"The different parts of a statute reflect light upon each other, and statutory provisions are regarded as in pari materia where they are parts of the same act. Hence, a statute should be construed in its entirety, and as a whole. The general intention is the key to the whole act, and the intention of the whole controls the interpretation of its parts. The fact that a statute is subdivided into sections or other parts should not obstruct or obscure the interpretation of the law as a whole. All parts of the act should be considered, compared, and construed together. It is not permissible to rest the construction upon any one part alone, or upon isolated words, phrases, clauses, or sentences, or to give undue effect thereto. The legislative intention as collected from an examination of the whole as well as the separate parts of a statute, is not to be defeated by the use of particular terms, but to the contrary, will prevail over the literal import thereof."

This applies equally to a statute as amended. 82 C.J.S. Statutes § 384, and cases cited. Where possible so to do, courts should construe a statute so as to harmonize and reconcile each part thereof with every other part.

"A construction that creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the act, and will carry out the intention of Congress." United States v. Raynor, 302 U.S. 540, 547, 58 S.Ct. 353, 356, 82 L.Ed. 413, rehearing denied, 303 U.S. 665, 58 S.Ct. 520, 82 L.Ed. 1123.

"Words and phrases are often found in different provisions of the same statute, which, if taken literally, without any qualification, would be inconsistent, and sometimes repugnant, when, by a reasonable interpretation—as by qualifying both, or by restricting one and giving to the other a liberal construction,—all become harmonious, and the whole difficulty disappears; and in such a case the rule is, that repugnancy should, if practicable, be avoided, and that, if the natural import of the words contained in the respective provisions tends to establish such a result, the case is one where a resort may be had to construction for the purpose of reconciling the inconsistency, unless it appears that the difficulty cannot be overcome without doing violence to the language of the law-maker." New Lamp Chimney Co. v. Ansonia Brass and Copper Co., 91 U.S. 656, 663, 23 L.Ed. 336.

"The amendment was a part of the same act and passed at the same time that the amendment to subdivision b of § 23 was, and we must assume that they were intended not to conflict, but to be in accord, as provisions for different situations. In other words, that it was the intention that each should have its proper application, distinct from and harmonious with that of the other." Wood v. A. Wilbert's Sons Shingle

and Lumber Co., 226 U.S. 384, 389, 33 S.Ct. 125, 128, 57 L.Ed. 264.

See: Mercantile-Commerce Bank & Trust Co. v. Commissioner of Internal Revenue, 8 Cir., 165 F.2d 307, 310, certiorari denied 333 U.S. 868, 68 S.Ct. 791, 92 L.Ed. 1146.

■ The Brotherhood, however, strenuously and with force, argues that Section 2, Eleventh (b), which requires a written assignment of dues by the employee, if there is to be any deduction at all, means that such an assignment, once given, is irrevocable for one year;[5] that nothing, including the exercise of a right to change unions, can make the authorization revocable in that time; that the checkoff machinery provided for in the Act is independent of the machinery for changing labor organizations; and that the Supreme Court, particularly in the Felter case cited below, has so held. The Rychlik and Switchmen's Union cases, infra, are also pressed upon us. We, therefore, look to those cases.

In Pennsylvania Railroad Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed. 2d 480, a qualified labor organization, the Brotherhood of Railroad Trainmen, was the collective bargaining representative for trainmen employed by the carrier and, in accordance with Section 2, Eleventh (a) and (c), had negotiated a union shop contract with the railroad. A certain trainman employee of the carrier at first was a member of the Brotherhood in good standing. Some months after the union shop contract became effective, the employee resigned from the Brotherhood and joined a competing union which he felt was "national in scope" and "organized in accordance with" the Act and therefore was a qualified labor organization and available for alternative membership. He was then charged with violation of the union shop agreement and, after hearings, was discharged by the carrier. The Supreme Court held

5. It is to be observed, for what it is worth, that the statute speaks in the affirmative, rather than in the negative, for it states that the written assignment "shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner."

that the employee's complaint, whereby he sought an injunction to compel the Brotherhood to reinstate him and the carrier to re-employ him, must be dismissed. It held specifically that a union was available for alternative membership, within Section 2, Eleventh (c), only when it was qualified, under Section 3, First of the Act, to participate in the election of the labor members of the National Railroad Adjustment Board. It said, at pages 488–489 of 352 U.S., at page 425 of 77 S.Ct.:

"At first glance the language of Section 2, Eleventh (c) would appear to be disarmingly clear: union-shop contracts are satisfied if the employee belongs to any union which happens to be national in scope and organized in accordance with the Act. * * * However, as so often happens, when the language of the statute is read, not in a vacuum, but in the light of the policies this Section was intended to serve, it becomes clear that the purpose of Congress was not, as respondent contends, to give employees in the railroad industry any blanket right to join unions other than the authorized bargaining representative, or to help dissident or rising new unions recruit new members. Rather, the sole aim of the provision was to protect employees from the requirement of dual unionism in an industry with high job mobility, and thus to confer on qualified craft unions the right to assure members employment security, even if a member should be working temporarily in a craft for which another union is the bargaining representative. And this right is given only to those unions which have already qualified as being 'national in scope' and 'organized in accordance with' the Act for the purpose of electing the union members of the NRAB under Section 3. * * *"

The court went on to say, at page 489, et seq. of 352 U.S., at page 426 of 77 S. Ct.:

"The purposes to be served by Section 2 are clearly revealed by its history. Until 1951 the Railway Labor Act did not permit union-shop contracts in the industry. In that year the Congress, persuaded by the established unions that it is unfair to allow nonunion employees to enjoy benefits obtained by the union's efforts in collective bargaining without paying any of the costs, passed Section 2, Eleventh of the Act, which authorized the union shop. However, the hearings on the bill revealed a problem, peculiar to the railroad industry, in establishing the union shop. Labor in this industry is organized largely on craft rather than industrial lines. Engineers, firemen, trainmen, switchmen, brakemen, and conductors, for example, each are separately organized for the purposes of bargaining. And normally different unions represent different crafts; thus, on the same railroad, firemen might be represented by the Brotherhood of Firemen and Enginemen, and engineers by the Brotherhood of Locomotive Engineers. Yet seasonal and other factors produce a high degree of job mobility for individual employees in the industry, that is, of shuttling back and forth between crafts. For example, a fireman may be temporarily promoted to engineer for a short time, or a conductor might have to serve temporarily as brakeman. Under the ordinary union-shop contract, such a change from craft to craft, even though temporary, would mean that the employee would either have to belong to two unions—one representing each of his crafts—or would have to shuttle between unions as he shuttles between jobs. The former alternative would, of course, be expensive and sometimes impossible, while the latter would be complicated and might mean loss of seniority and union benefits.

"So Congress faced the problem of reconciling the union shop with some protection to employees who shifted from one craft to another one represented by a different labor organization under a union-shop contract. The solution, of course, was evident: to provide that if a fireman, for example, is temporarily promoted to engineer, he can satisfy the union-shop contract of the engineers although still remaining a member of the union representing the firemen.

"As a result, the Committee reporting the bill to the Senate offered on the Senate floor the following amendment to subsection (a) of Section 2, Eleventh:

" 'Provided further, That no such (union shop) agreement shall require membership in more than one labor organization.' "

The court noted that a substitute amendment, drafted by the railroad brotherhoods, was later offered and that this amendment became Eleventh (c). It then said, at page 492, et seq. of 352 U. S., at page 427 of 77 S.Ct.:

"Senator Hill explained that the purpose of this substitute was the same as that of the previous amendment:

" '(The amendment does) nothing more nor less than what the committee desires to do, and what was the intent of the committee in offering its amendment, that no employee of a railroad should be required to belong to more than one labor organization. The only difference between the committee amendment and the amendments now before the Senate, which have been agreed upon by all the railroad organizations, is that the amendments now before the Senate spell out in much more detail the purposes of the committee amendment than did the committee amendment. But the intent and the purpose * * * are exactly the same.'

This amendment passed as introduced and now forms subsection (c).

"It thus becomes clear that the only purpose of Section 2, Eleventh (c) was a very narrow one: to prevent compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts. The aim of the Section, which was drafted by the established unions themselves, quite evidently was not to benefit rising new unions by permitting them to recruit members among employees who are represented by another labor organization. Nor was it intended to provide employees with a general right to join unions other than the designated bargaining representative of their craft, except to meet the narrow problem of intercraft mobility. This is made particularly clear when the provision is taken in the context of American labor relations in general. The National Labor Relations Act contains no parallel to subsection (c), and employees under a union-shop contract governed by that Act must join and maintain membership in the union designated as the bargaining representative or suffer discharge. Similarly, subsection (c) does not apply to nonoperating employees, where the problem of seasonal intercraft movement does not exist. Railroad employees such as clerks working under a union-shop contract have no right at all to join a union other than the bargaining representative. In other words, once a union has lawfully established itself for a period of time as the authorized bargaining representative of the employees under a union-shop contract, Congress has never deemed it to be a 'right' of employees to choose between membership in it and another competing union. If Congress intended to confer such a right, it would scarcely have denied the right to nonoperating employees of the railroads or industrial employees under the National Labor Relations Act. The purpose of Sec-

tion 2, Eleventh (c) was simply to solve the problem of intercraft mobility under railroad union-shop contracts."

The court went on to consider how Congress achieved this purpose, and it said at page 494, et seq. of 352 U.S., at page 428 of 77 S.Ct.:

"Section 2, Eleventh (c) provides that for operating employees a union-shop contract can be satisfied by membership in 'any one of the labor organizations, national in scope, organized in accordance with this Act * * *.' At first blush this would appear to confer on employees a blanket right to choose between alternative unions which are, in the abstract, national in scope and organized in accordance with the Act. But when taken in the context of the Railway Labor Act, as a whole, it becomes apparent that this language refers to a certain *group* of unions, a group already constituted. * * * This reference to an already constituted group of unions is emphasized by the fact that Congress in Section 2, Eleventh (c) did not say that an employee under a union-shop contract could join 'any' labor organization which was national in scope and organized in accordance with the Act; rather it said that such an employee could join '*any one of the*' labor organizations which are national in scope and organized in accordance with the Act. In short, Congress in Section 2 was referring to a group of unions already defined and constituted under the Section 3 procedures. And therefore an employee has available to him alternative membership only in such unions as have already qualified as electors under Section 3.

"This interpretation of the Act solves the problem which Congress faced without conferring on employees 'floating' rights which Congress did not intend to grant. * * *

"Moreover, to sanction such a 'floating' right in employees would make only for confusion and uncertainty in labor relations in the railroad industry. No employee could with safety join an alternative union, for he could not know until after-the-fact adjudication whether that union meets the requirements of Section 2. On the other hand, interpreting Section 2 to refer to those unions which have already qualified as electors under Section 3 means that an employee will always know or can easily ascertain the unions which he can join as an alternative to his bargaining representative. A new union, such as UROC, could make itself available for such alternative membership by seeking certification as an elector through the impartial procedure of Section 3, First (f). And the decision of the 'board of three' provided by that Section would be prospective, uniform throughout the nation, and would be the ruling of an administrative body established to deal with precisely this question.

"We hold, therefore, that Section 2, Eleventh (c) of the Act makes only such unions available for alternative membership under a union-shop contract, such as this one, as have already qualified as electors for the labor members of the NRAB under Section 3, First."

We have quoted from Rychlik at length because of the Brotherhood's reliance upon it and because we wish no possibly erroneous inference to be drawn from isolated portions of the opinion out of context. Some of Rychlik's language, it must be admitted, seems to prohibit change in union membership and to restrict a railroad employee to membership in the designated bargaining representative of his craft, with the sole exception of meeting the problem of intercraft mobility characteristic of the railroad industry. It is to be noted, however, that the court's opinion concludes with the holding that Eleventh (c) does make available to the employee alternative membership in certain unions qualified

under Section 3, First. In the case before us there is no problem of an unqualified competing union. The union which the defendant's employee joined is a qualified labor organization available for alternative membership within the holding of Rychlik and there is no question as to whether the employee "could with safety join" this union of his present choice. Here there is certainty of qualification. Reading Rychlik in the light of the facts then before the Supreme Court, namely, the distinction between a qualified labor organization and one which did not meet the requirements established by the statute, as interpreted by the court, the holding affords no barrier to the conclusion we reach here.

Felter v. Southern Pacific Co., 359 U. S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854 was an action by a carrier's employee against the carrier and the Brotherhood of Railroad Trainmen for a determination that their refusal to accept his revocation of a wage assignment was violative of his statutory right under Eleventh (b) to revoke the assignment. The Dues Deduction Agreement between the Brotherhood and the carrier required that there be used, as a necessary form for revoking an assignment, only a writing executed on a form furnished by the Brotherhood and forwarded by it to the carrier. The employee had been a member of the Brotherhood and had executed an assignment authorizing the checkoff in favor of that organization. *More* than a year thereafter, the employee decided to join the Order of Railway Conductors and Brakemen, which was a qualified union. He notified the Trainmen of his resignation by letter and advised them that he was revoking the authorization for checkoff and that he had sent a revocation form to the carrier. The carrier and the Trainmen declined to honor the revocation forms although they were identical with the one prescribed by their Dues Deduction Agreement. Because of this, the checkoff of the employee's dues was not terminated. The Supreme Court, disagreeing with the courts below, D.C., 155 F.Supp. 315, and 9 Cir., 256 F.2d 429,

held that the restrictive provisions of the Dues Deduction Agreement violated Section 2, Eleventh. The court noted that the failure of the 1951 amendment to authorize agreements binding employees to submit to the checkoff was deliberate on the part of Congress and said, 359 U.S. at page 333, et seq., 79 S.Ct. at page 853:

"The structure of § 2 Eleventh (b) then is simple: carriers and labor organizations are authorized to bargain for arrangements for a checkoff by the employer on behalf of the organization. Latitude is allowed in the terms of such arrangements, but not past the point such terms impinge upon the freedom expressly reserved to the individual employee to decide whether he will authorize the checkoff in his case. Similarly Congress consciously and deliberately chose to deny carriers and labor organizations authority to reach terms which would restrict the employee's complete freedom to revoke an assignment by a writing directed to the employer after one year. Congress was specifically concerned with keeping these areas of individual choice off the bargaining table. It is plainly our duty to effectuate this obvious intention of Congress, and we must therefore be careful not to allow the employee's freedom of decision to be eroded in the name of procedure, or otherwise. We see no authority given by the Act to carriers and labor organizations to restrict the employee's individual freedom of decision by such regulations as were agreed upon in the Dues Deduction Agreement. The question is not whether these restrictions might abstractly be called 'reasonable' or not. * * *

"The Trainmen next justify the procedure as a necessary protection to the employee from himself—that is, from his desire to revoke the checkoff—and from outside undue influence to do so, presumably that of a rival organization or of manage-

ment. But Congress apparently foresaw and discounted any necessity for this protection when it took the matter out of the hands of the carriers and labor organizations, and left it to the employee's individual choice. It did not make any provision for preliminary correspondence or dealings between the employee and the organization when the employee wanted to stop the checkoff, whether incident to terminating his affiliation or not. The complete freedom of individual choice in this area, undampened by the necessity of such preliminary dealings with the labor organization to make it effective, may seem unfortunate to labor organizations, but it is a problem with which we think Congress intended them to live.

" * * * And within the area that the Act leaves open for solicitation by rival organizations—as where no union shop has been established, or within the area where even a worker under a union-shop arrangement can change affiliations, see Pennsylvania R. Co. v. Rychlik, 352 U.S. 480, 492–494, 77 S.Ct. 421, 427, 428, 1 L.Ed.2d 480—the matter may be far from trivial, as the facts in this case suggest. Organizational efforts are attended by persuading the recruit to drop his membership in his present union and terminate any checkoff of his wages in its favor."

At this point footnote 13 is appended to the opinion. It reads:

"The respondents make some suggestion that petitioner was not harmed because in any event the carrier could not continue a checkoff in favor of the Trainmen after it learned that he was no longer a member. Section 2, Eleventh (c) provides that 'no (checkoff) agreement made pursuant to subparagraph (b) shall provide for deductions from his (an employee within specified categories) wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership.' 64 Stat. 1238. *But there is no showing when the carrier received notice of petitioner's change of membership; the papers used by him to revoke the checkoff and furnished the carrier did not refer to such a change.* And of course a worker could revoke his checkoff authorization and remain a member of the same labor organization. It is clear that Congress meant to make the checkoff machinery stand on its own feet and be independent of any machinery for changing labor organizations—notice of which would ordinarily be sent only to the organizations involved." (Emphasis added.)

The court then concludes its opinion, 359 U.S. at pages 337–338, 79 S.Ct. at page 855:

"There may well be a difference in the weight of persuasion necessary to enlist the worker if he cannot at once effectuate his intentions through papers furnished him on the spot by the recruiting organization. We do not say whether the 'cooling off' period which the procedure insisted upon here creates would be wise or unwise as a matter of policy. It is enough to say that we believe the Act has not left any place for it. We think the added requirement involved here is meaningfully burdensome when considered in context; but in any event, we do not think the Act empowered carriers and labor organizations to bargain for any restrictions on the individual's right to revoke his assignment, even if later, while insisting on them, they choose to describe them as petty."

The Brotherhood claims that footnote 13 meets the facts of the case before us. We feel that it does not, or, more particularly, that Felter and its footnote do not demand a conclusion that termination of union membership within the one year period nevertheless requires the continuance of the checkoff so long as the em-

ployee remains in the carrier's employment. The footnote at best is dictum. It is interesting to observe that in Felter it was the Brotherhood (and the carrier) and not the employee who was suggesting that the carrier could not continue a checkoff after it learned that the employee was no longer a member. The point itself was not decided for the court avoided it with the footnote observation that there was no showing when the carrier received notice of the employee's change of union membership. Of course the checkoff machinery and the machinery for changing labor organizations are independent, for there can be no dispute that after the one year period the employee has the power, under the statute, to terminate the checkoff, and he can still maintain his union standing by paying his dues directly. The case, particularly in the language quoted above, gives hearty emphasis to freedom of the employee and to his individual "freedom of decision." Further, change of membership among qualified unions was involved in that case and, so far as the written opinion is concerned, this factual detail afforded neither the court nor the litigants any difficulty. Nor is there anything in that opinion which reveals that the change was within the area of temporary and seasonal job mobility. Felter, we feel also must be read and interpreted in the light of its facts.

Switchmen's Union of North America v. Southern Pacific Co., supra, 9 Cir., 253 F.2d 81, was an action instituted by the carrier for relief under the Declaratory Judgments Act. The carrier and the Brotherhood of Railroad Trainmen had entered into a Dues Deduction Agreement which purported to impose the checkoff, for the benefit of the Trainmen, of dues of employees who were yardmen members of the Trainmen. Switchmen's Union of North America, however, had been certified as the exclusive collective bargaining representative of the carrier's craft of yardmen. The District Court, 138 F.Supp. 919, 922, upheld the checkoff agreement, read Section 2, Eleventh (b) in what it thought was

the light of the alternative membership provision of Eleventh (c), and said that "* * * the employee is not tied as far as payment of dues (and hence the dues checkoff) is concerned to the union holding the contract with the carrier, but rather to the union in which he holds membership." The Ninth Circuit reversed and on re-hearing stressed that portion of Eleventh (b) which calls for payment of deducted dues to the labor organization "representing the craft or class of such employees" [253 F.2d 84] and held that by making the dues checkoff agreement with the Trainmen applicable to the yardmen members, the carrier had violated its obligation to bargain exclusively with the Switchmen's union as to all matters pertaining to yardmen. The court stated that, under Rychlik, Eleventh (c) should be construed narrowly and that its only purpose was, in the words of the Supreme Court, "to prevent compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts." On this thesis it dismissed an argument that Eleventh (c) justified the deduction of dues and payment thereof to a labor organization in which the employee holds membership, pursuant to a dues deduction agreement with that union, even though another union was the representative of the craft.

It must be conceded that this opinion of the Ninth Circuit, so far as it appears narrowly to construe Eleventh (c), lends some force to the posture of the Brotherhood here. We feel, however, that Eleventh (b) and (c) are to be construed together, that it is possible to do so with consistency of result, and that the accepted principle of consistency in construction, referred to above, is applicable here. Furthermore, the actual holding in Switchmen goes no further than to say that the Dues Deduction Agreement between the carrier and the Trainmen was invalid to the extent it purported to apply to yardmen members of the Trainmen. The specific holding therefore is in accord with our initial conclusion reached

above, namely, that Eleventh (b) and (c), taken together, may be consistently construed to the effect that a Dues Deduction Agreement between a carrier and a qualified labor organization can be applicable only to employee members of that organization who at the same time are members of the craft the organization represents. Switchmen so holds and we agree with that holding. If there is any additional inference to be drawn from Switchmen to the effect that Eleventh (c) is subordinate to Eleventh (b), we do not accept that inference. In other words, we agree with the conclusion of the Ninth Circuit on the facts present in its case but we do not go so far as to say that that case compels a ruling favorable to the Brotherhood in the case before us.

Certain factors merit further emphasis:

1. The underlying permissive as distinguished from mandatory philosophy of Paragraph Eleventh. As noted above, the union shop had been barred prior to 1951 by Section 2, Fourth and Fifth of the Act. Section 2, Eleventh, permitting bargaining between the union and the carrier on the union shop issue, was thus, as has also been noted, a re-versal of prior Congressional policy. However, it only permits and does not command the carrier and the labor organization to discuss and to agree to the union shop as an element of collective bargaining. Further, it permits and does not command the checkoff as something else to be bargained for. Even then, the checkoff is restricted to periodic dues, initiation fees and assessments and any application to fines and penalties is specifically proscribed. The Act emerged from Congress in this form, even though as originally introduced in both House and Senate it simply would have made the checkoff, once agreed to, compulsory. Felter, at page 332 of 359 U.S., at page 853 of 79 S.Ct., H.R. No. 2811, p. 1, and S.R. No. 2262, pp. 1 and 2, 81st Congress, Second Session. It thus was made to parallel the Taft-Hartley Act, 29 U.S.C.A. § 186(c) (4).[6] The Congress might have favored rigidity and compulsion so far as the provisions of Section 2, Eleventh were concerned although in so doing it might have opened up other questions of constitutionality. See Railway Employes' Department v. Hanson, 351 U.S. 225, 238, 242, 76 S.Ct.

---

6. The question now before us apparently has not as yet been decided in connection with the cited parallel provision of the Taft-Hartley Act. Its existence, however, seems to have been noted. Chief Judge Knox of the Southern District of New York, in General Electric Co. v. Emspak, D.C., 94 F.Supp. 601, 603–604, observed that Taft-Hartley "enunciates a policy of solicitude for the rights of employees with respect to the check-off" and went on to say:

"Where an irrevocable authorization exists, there is scant authority on the question as to whether an employee can revoke the assignment in the event of an expulsion of his union from the international.

"In Durkin v. John Hancock Life Ins. Co., D.C.S.D.N.Y., 92 F.Supp. 893, Judge Clancy expressed the view that the employees would at least have a colorable claim to the deductions. But, he did not decide the question.

"In some of the opinions which have considered disputes stemming from the disaffiliation of the U.E. with the C.I.O., the Courts have indicated that the interests of the employees, rather than that of the contending unions, should govern. Huntsman v. McGovern, Ohio Com.Pl. 1949, 91 N.E.2d 717; Duris v. Iozzi, 6 N.J.Super. 530, 70 A.2d 793. * * *

"Here, however, there is a controlling distinction which makes it unnecessary to pass upon the implications of the above authorities. The check-off authorizations, which were executed by the General Electric employees, reserved to such employees the right to revoke the assignment upon 30 days' notice. Thus, there is no question here of the employees being held to a contractual commitment after supervening events render adherance to the obligation undesirable. Employees were always free, if discontented with the extent of union representation they were receiving, or for any other reason, to terminate dues deductions."

714, 721, 722, 100 L.Ed. 1112. Inasmuch as Congress has failed to do so, we are disinclined to apply an attitude of rigidity and compulsion with respect to the same statute's clause concerning the revocation of dues assignments.

2. The apparent concern of Congress to preserve an area of freedom for the individual employee. This is evident from the fact that the statute requires that the checkoff, even though agreed upon by the union and the carrier, remains an element of choice for the employee. He may choose to disregard it and to maintain his union status by direct or personal payment of dues, initiation fees and assessments. And once having properly authorized the checkoff, he may still revoke it, even though remaining in the same union and employed by the same carrier, by proper writing after the expiration of one year.

3. The obvious desire on the part of Congress—and its recognition by the Supreme Court—to avoid compulsory dual unionism. Rychlik, supra, at page 492 of 352 U.S., at page 427 of 77 S.Ct. To hold that an employee who has properly become a member of another qualified labor organization must continue, at least for the rest of the year, to pay dues and assessments through the route of the checkoff to his former union requires, it seems to us, compulsory dual unionism, penalizes the employee, and creates unjust enrichment of the first union. This cannot be the result where there has been no dues assignment and we doubt if such a result is intended where there has been one.

4. The inability of the one year provision of Eleventh (b) to guarantee to the union the collection of dues, and the like, under all conceivable circumstances. Death of the employee or termination of his employment by resignation or otherwise are instances where the one year provision certainly is rendered ineffective. We feel that permissible change of membership to another qualified labor organization during the year is another. Nor is it an answer to this to say that this gives too much freedom to the employee, with resulting expense and nuisance for the union and the carrier. That freedom is present in the absence of a dues assignment and this seems to be so even in the situation, where, under Section 2, Eleventh (c), first proviso, a non-union employee may be required initially to join that qualified labor organization which then represents the craft in which he is employed.

5. The provisions of the Dues Deduction Agreement itself, quoted in footnote 4, supra. This Agreement provides for deduction of dues from wages of employees "who acquire or maintain membership in the Brotherhood." Maintenance of membership seems to be something contemplated by the Agreement wholly apart from compulsory membership under the one year provision.

On oral argument of the case to this court, the carrier suggested, evidently for the first time, that if the checkoff is to be maintained with respect to this employee beyond the time of his change of union membership, it constitutes the imposition of a penalty contrary to the specific provisions of Eleventh (b) and of the Dues Deduction Agreement itself. Without detracting from the cogency of this argument, we need not consider it here.

We feel it worthwhile to observe also—although this involves an element of speculation—that the purpose of the one year provision may well have been to provide some stability for the carrier's accounting purposes and to minimize, so far as possible, the paper work and its consequent expense which the checkoff necessarily places upon the carrier. See opinion of Mr. Justice Black, dissenting, in Felter, at page 338 of 359 U.S., at page 855 of 79 S.Ct. It then seems rea-

sonable for Congress to have provided that, once an employee has chosen, by the checkoff and the dues assignment, to receive the benefit of no further concern on his part for prompt and regular payment of dues and thus for maintenance of his union status, the carrier should be entitled to some relief from the burden and expense of frequent change of mind and direction on the part of the employee during the continuance of his employment and of his membership in the same union. This concern was apparently persuasive upon the Congress but not beyond the point of preserving to the employee complete freedom of choice after one year from the date of the execution of the dues assignment.

The judgment appealed from is affirmed.