John P. O'CONNELL, R. A. Gallo, and Charles Doyle, individually and in behalf of all members of the Switchmen's Union, who are employed by the Erie Lackawanna Railroad Company, and Switchmen's Union of North America, AFL-CIO, an unincorporated association, Plaintiffs,

v.

ERIE LACKAWANNA RAILROAD COMPANY, a corporation, the Brotherhood of Railroad Trainmen, an unincorporated association and Griff Davis, individually and as General Chairman of the Brotherhood of Railroad Trainmen, and W. J. Weil, individually and in behalf of all members of the Brotherhood of Railroad Trainmen, Defendants.

No. 67 Civ. 1264.

United States District Court
S. D. New York.

April 27, 1967.

Sturm & Perl, New York City, Alan F. Perl, New York City, of counsel, and Lee Leibik and Ruth Weyand, Chicago, Ill.,

Lee Leibik and Ruth Weyand, Chicago, Ill., of counsel, for plaintiffs.

Raymond H. Branda, New York City, for defendant Erie Lackawanna R. R. Co.

Arnold B. Elkind, New York City, for defendants Brotherhood of Railroad Trainmen and W. J. Weil, individually.

## OPINION

HERLANDS, District Judge:

The instant motion for a preliminary injunction, brought on by an order to show cause, raises important questions as to the proper interpretation of the 1951 amendments to the Railway Labor Act. Plaintiffs are three yard service employees of the defendant Erie Lackawanna Railroad Company [hereinafter referred to as the Erie], who sue individually and on behalf of all members of the Switchmen's Union of North America, AFL–CIO, [hereinafter referred to as the Switchmen's Union] employed by the defendant railroad. The Switchmen's Union is also a party plaintiff. The defendants are the Erie, the Brotherhood of Railroad Trainmen [hereinafter referred to as the Brotherhood], and two officers of the Brotherhood who are sued in their individual and representative capacities.

According to the verified complaint, the Delaware, Lackawanna & Western R. R. Co. and the Erie Railroad merged in October, 1960, to form the defendant railroad. For many years prior to the merger the Switchmen's Union had been the duly designated and recognized representative of the craft or class of yard foremen, helpers and switch tenders [hereinafter referred to as yard service employees] of the Delaware, Lackawanna & Western R. R. Co., while the Brotherhood similarly represented the yard service employees of the Erie Railroad.

In March, 1964, the National Mediation Board conducted an election among all of the yard service employees of the merged railroad. The Brotherhood received 43 more votes than the Switchmen's Union, and was designated as their representative. Until March, 1967, the collective bargaining agreement between the Brotherhood and the Erie, like the pre-merger agreements of both the Switchmen's Union and the Brotherhood, contained a union shop clause which was expressly qualified by the language of Section 2, Eleventh (c) of the Railway Labor Act. Under this agreement, more than 500 yard service employees of the Erie maintained membership in the Switchmen's Union without joining the Brotherhood.

On March 14, 1967, the Brotherhood and the Erie entered into a new collective bargaining agreement, effective immediately, which provided that, as a condition of continued employment, all yard service employees in the New York Terminal Yards of the Erie "shall become and remain members" of the Brotherhood. No alternative membership clause was included in the union shop provision.

The essence of plaintiffs' claim is that this strict union shop agreement violates the Railway Labor Act in that it fails to provide—in accordance with Section 2, Eleventh (c) (45 U.S.C. § 152 Eleventh (c))—that the requirement of union membership shall be satisfied if an employee maintains membership in any one of the labor organizations, national in scope, organized in accordance with the Railway Labor Act, and admitting to membership employees in any of the services or capacities covered by the First Division of the National Railroad Adjustment Board.

The complaint further alleges that the Brotherhood and the Erie "have threatened and are threatening" to discharge the individual plaintiffs and all other members of the Switchmen's Union employed by the Erie, unless they end their membership in the Switchmen's Union and become and remain members of the Brotherhood.

Each of the plaintiffs and the members of the class they represent have seniority rights and other employment benefits which would be lost in the event of a discharge for failure to join the Brotherhood as required by the new agreement. On the other hand, valuable

insurance rights would be lost if they failed to continue membership in the Switchmen's Union. Yet, the constitution of the Brotherhood bars dual membership in a union, such as the Switchmen's Union, which is seeking representation rights on behalf of the same class of employees on the same railroad. Even if they are not discharged for maintaining membership in the Switchmen's Union, they could not afford to pay fees and dues to two unions.

On the basis of these factual allegations, plaintiffs contend that their rights —protected under Section 2 of the Railway Labor Act—are being infringed, and that the defendants have caused and are threatening to cause irreparable injury to the plaintiff employees for which no remedy in money damages is available. They pray for a preliminary and permanent injunction restraining the defendants from "discharging or threatening to discharge, or attempting to cause the discharge" of any employee who fails to join the Brotherhood, so long as he maintains membership in the Switchmen's Union. They also seek a judgment declaring the union shop agreement null and void. Finally, plaintiff Switchmen's Union asks for money damages in the sum of 100,000 dollars.

The Brotherhood's verified answer admits that Exhibit A annexed to the complaint is a true copy of the collective bargaining agreement entered into between the Brotherhood and the Erie, but denies its illegality and denies substantially all of the other allegations of the complaint. Of immediate significance on this motion is defendant Brotherhood's denial that this Court has jurisdiction to construe the collective bargaining agreement, because Congress has vested exclusive jurisdiction over such disputes in the National Railroad Adjustment Board, and to system, group or regional Boards of Adjustment. The Brotherhood further denies that this Court has jurisdiction to determine the legality of the agreement under the Railway Labor Act until the plaintiff employees have exhausted the procedures of the contract. The Brotherhood's verified answer also contains a counterclaim for libel.

The question of jurisdiction may be disposed of summarily. Plaintiffs invoke the power of this Court under 28 U.S.C. § 1337 conferring original jurisdiction upon this court of civil actions arising under any Act of Congress regulating Commerce, and under 28 U.S.C. § 2201, creating the remedy of declaratory judgments.

While the National Railroad Adjustment Board has exclusive and primary jurisdiction over disputes concerning the meaning of collective bargaining agreements in the railroad industry (Slocum v. Delaware, Lackawanna & Western R. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950)), and the instant agreement expressly provides its own procedure in cases of non-compliance with its provisions, it is well settled that the federal district courts have jurisdiction to grant injunctive and declaratory relief when the legality of such an agreement under the Railway Labor Act is called in question. See. e. g., Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 774, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); Graham v. Brotherhood of Locomotive Firemen & Engineers, 338 U.S. 232, 239, 70 S.Ct. 14, 94 L.Ed. 22 (1949); Tunstall v. Brotherhood of Locomotive Firemen & Engineers, 323 U.S. 210, 212–213, 65 S.Ct. 235, 89 L.Ed. 187 (1944); Switchmen's Union of North America v. Southern Pacific Co., 253 F. 2d 81 (9th Cir.), cert. denied, 358 U.S. 818, 79 S.Ct. 29, 3 L.Ed.2d 60 (1958).

The present action is governed by the principles expounded by the above decisions. There is here no question as to the proper construction of a collective bargaining agreement or its proper application to specific employees; rather, the issue posed is a straightforward question of statutory interpretation.

The Brotherhood frankly conceded upon oral argument—as it was obviously compelled to do—that the union shop

clause [1] of the new collective agreement would violate Section 2, Eleventh (c) of the Railway Labor Act if the latter were construed literally. The Brotherhood contends, however, that the legislative history of the provision in question, and the decisions construing it, unmistakably demonstrate the legality of the disputed agreement in the circumstances here prevailing.

Resolution of the issue posed necessarily depends upon an understanding of the purpose underlying Section 2, Eleventh (c) and the specific means chosen by Congress to effectuate that purpose.

Until 1951, union shop agreements were outlawed in the railroad industry. The prohibition had been added to the Railway Labor Act in 1934 at the behest of the unions themselves because such agreements had been used by the railroads to perpetuate company unions. This problem having become dissipated with time, Congress amended the Act in 1951 to permit negotiation of union shop agreements. Section 2, Eleventh (a) (45 U.S.C. § 152 Eleventh (a)).

The provision enacted substantially parallels the law applicable to industry in general under the National Labor Relations Act. (29 U.S.C. §§ 157, 158). Its essential purpose is to permit unions—through agreements with employers—to compel the entire membership of the class of employees represented to bear an equitable portion of the cost of such representation. During the hearings leading to the 1951 amendments, however, the unions called attention to a problem—peculiar to the operating trades in the railroad industry—which would result from introduction of the union shop.

As described by the Supreme Court in Pennsylvania R. R. Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480 (1952):

"Labor in this industry is organized largely on craft rather than industrial lines. Engineers, firemen, trainmen, switchmen, brakemen, and conductors, for example, each are separately organized for the purposes of bargaining. And normally different unions represent different crafts; thus, on the same railroad, firemen might be represented by the Brotherhood of Firemen and Enginemen, and engineers by the Brotherhood of Locomotive Engineers. Yet seasonal and other factors produce a high degree of job mobility for individual employees in the industry, that is, of shuttling back and forth between crafts. For example, a fireman may be temporarily promoted to engineer for a short time, or a conductor might have to serve temporarily as brakeman. Under the ordinary union-shop contract, such a change from craft to craft, even though temporary, would mean that the employee would either have to be-

---

1. The union shop clause of the collective bargaining agreement between the Brotherhood and the Erie reads as follows:
"1. It is agreed, as a condition of continued employment, that within sixty calendar days following the beginning of such employment, all conductors, ticket collectors, baggagemen, and trainmen of the Erie Lackawanna Railroad Company, former DL&W District, yard service employees engaged in yard service in the New York Terminal Yards including Paterson, N. J., Newark, N. J. and Dundee, N. J., Port Jervis, N. Y., Middletown, N. Y., Newburg, N. Y., Syracuse N. Y., Utica, N. Y., and Scranton, Pa., represented by the Brotherhood of Railroad Trainmen (Eastern District) shall become and remain members of the said Brotherhood: Provided, that this agreement shall not require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership has been denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership in the Brotherhood of Railroad Trainmen."

long to two unions—one representing each of his crafts—or would have to shuttle between unions as he shuttles between jobs. The former alternative would, of course, he expensive and sometimes impossible, while the latter would be complicated and might mean loss of seniority and union benefits." (352 U.S. at 490, 77 S.Ct. at 426.)

The legislative representative of the defendant Brotherhood proposed an amendment to the bill at the House and Senate committee hearings, which was aimed at accommodating the needs of employees subject to the problem of intercraft mobility. The proposed amendment read as follows:

"provided that when two or more such crafts or classes are closely related as respects the work performed by each and employment rights in more than one of them are held by the same employee, or promotions from one of such crafts or classes to another are had, the requirement for membership shall be satisfied by membership in the organization of the employee's choice, which is the duly designated or recognized craft or class representative of any one of them."

(Hearings before a Subcommittee of the Committee on Labor and Public Welfare, United States Senate, 81st Cong., 2nd Sess. on S. 3295, p. 69; Hearings before the Committee on Interstate and Foreign Commerce, House of Representatives, 81st Cong., 2nd Sess. on H.R. 7789, pp. 32–33.)

On the other hand, the spokesman for the Railway Labor Executives Association—representing twenty-one major railway unions including three of the five major unions in the operating trades [2]—urged that the problem of intercraft mobility be left to collective bargaining.

The bill permitting union shop agreements was reported to the Senate without amendment, but the Committee offered an amendment on the Senate floor which read:

*"Provided further,* that no such [union shop] agreement shall require membership in more than one labor organization." 1950 Cong.Rec., p. 15735.

When the Senate again considered the bill after a temporary adjournment, a substitute amendment—drafted at a conference of the railroad labor organizations—was offered [3] and approved. That amendment forms the present Section 2, Eleventh (c), the provision here in controversy. It reads as follows:

"(c) The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, that is, an employee engaged in any of the services or capacities covered in the First Division of paragraph (h) of section 153 of this title, defining the jurisdictional scope of the First Division of the National Railroad Adjustment Board, if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services; and no agreement made pursuant to subparagraph (b) of this paragraph

---

**2.** The three unions are the Switchmen's Union, the Brotherhood of Firemen and Enginemen and the Order of Railway Conductors. The remaining two major unions are the defendant Brotherhood— which had submitted its own proposed amendment—and the Brotherhood of Locomotive Engineers—which had opposed any and all legislation permitting union shop agreements.

These five unions are the only ones represented by members of the First Division of the National Railroad Adjustment Board.

**3.** Senator Hill, in explaining the substitute amendment after he had offered it on the floor of the Senate, stated that: "the only purpose of the amendment is to make sure that a person employed by one of the railroads does not have to belong to more than one union." 1950 Cong.Rec. p. 16268.

shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: *Provided, however,* That as to an employee in any of said services on a particular carrier at the effective date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: *Provided, further,* That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services."

## I. PLAINTIFFS' PROBABILITY OF SUCCESS

It is the Brotherhood's contention that the explicit language of Section 2, Eleventh (c) is inapplicable here, because "the 'narrow problem of intercraft mobility' does not exist with respect to the employees covered by this contract." The reason given is that "all involved crafts on the railroad are represented by the Brotherhood of Railroad Trainmen and there can be no problem of compulsory dual membership." (Defendant Brotherhood's Memorandum of Law, p. 9.) Correlatively, the Brotherhood argues that, since the Switchmen's Union does not presently serve as authorized bargaining representative for any of the Erie's employees, the plaintiffs here cannot invoke the protection of Section 2, Eleventh (c).

In effect, the Brotherhood is asking for a construction of the statute which conforms to the explicit language of the proposed amendment which the Brotherhood submitted to the House and Senate committees during the 1950 hearings on the legislation. That construction would permit an employee—in lieu of joining the labor organization having the union shop agreement—to maintain membership in a labor organization "which is the duly designated or recognized * * * representative of *any one* of [the crafts or classes in which the employee has employment rights]." Hearings, supra. (Emphasis added.)

The recited legislative history demonstrates, however, that the Brotherhood's proposed amendment was not adopted by either of the legislative committees. Rather, the amendment offered and accepted on the floor of the Senate—which forms the present Section 2, Eleventh (c)—was drafted collectively by the unions themselves.[4] The detailed language of the provision delineates the explicit means for dealing with the problem of intercraft mobility which was chosen by the unions and adopted by Congress.

In the face of this history, it would be a usurpation of the legislative function for this Court to assert that the language does not mean what it says, or that the problem of intercraft mobility ought to be handled by some other approach. While the plain meaning rule is not well regarded in this Circuit,[5] and

---

4. Until very recently, both the plaintiff Switchmen's Union and the defendant Brotherhood, among others, have expressly conditioned their union shop agreements by the literal terms of Section 2, Eleventh (c). Cf. NLRB v. Drivers, etc., Local Union, 362 U.S. 274, 290, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960); United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

5. See, e. g., Federal Maritime Commission v. DeSmedt, 366 F.2d 464, 469–470 (2d Cir. 1966); Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co., 326 F.2d 841, 845 (2d Cir. 1963); Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

has very recently been criticized by the Supreme Court in construing labor legislation,[6] the specificity of this particular provision and its legislative history leave little interpretative flexibility.

Most significantly, moreover, we have no reason to doubt that the explicit means delineated by Section 2, Eleventh (c) is the soundest approach to the problem of intercraft mobility.

The Brotherhood argues that Section 2, Eleventh (c) should not be construed to bar strict union shop provisions when the particular factual circumstances do not involve the problem of intercraft mobility. How—as a practical matter—would such a construction of the statute be implemented?

On each occasion that a strict union shop agreement is executed, the employees who are members of a minority union would be faced with the dilemma with which the instant plaintiffs are confronted. As here, the question of the validity of the agreement inevitably would find its way into the federal courts for an ad hoc adjudication.

But what evidence should be admitted, and what standards should the Court employ in determining the quality and magnitude of the problem of intercraft mobility in a particular situation? Is the Court to make a subjective evaluation of the relatedness of various crafts, the mobility of individual employees, the likelihood of a change in the bargaining representative resulting from shifts in the level of employment, etc.?

While the Brotherhood asserts that a possible standard could be whether the minority union is the designated or recognized representative of any related class or craft, the legislative history indicates that this approach was explicitly suggested to the Congressional committees by the Brotherhood but not adopted by them. It may well be that the rail-

road unions who drafted this provision collectively, and Congress in adopting their proposal, had chosen the specific approach delineated in Section 2, Eleventh (c)—recognizing that bargaining representatives may change with shifts in the level of employment as employees shuttle between crafts—so as not to upset the balance of union power which existed under the prevalent practice of having substantial enclaves of minority union members existing in the jurisdiction represented by the majority union.

In any event, whatever may be the advantages or disadvantages of other approaches to the problem of intercraft mobility, the means provided by the literal terms of Section 2, Eleventh (c) accommodates the needs of the employees in the operating crafts without promoting internal warfare between unions. Moreover, the provision—literally construed—reconciles the problem of intercraft mobility with the primary policy underlying the 1951 amendments to allow for an equitable sharing of the cost of representation. For, by limiting alternative membership to those unions which qualify as electors to the First Division of the National Railroad Adjustment Board,[7] membership may be confined to those unions which share the costs of administration of the NRAB, and join together in other respects in negotiating and policing collective bargaining agreements.[8]

Absent specific direction by Congress, it would be most imprudent for the federal courts to reach out to create another approach to the problem of intercraft mobility, and thereby assume the role of referee in interunion power struggles. Cf., Pennsylvania R. R. Co. v. Rychlik, 352 U.S. 480, 496, 77 S.Ct. 421, 1 L.Ed. 2d 480 (1957).

*Rychlik and Rohrer*

The Brotherhood purports to find conclusive support for its position here in

---

6. National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 618, 619, 87 S.Ct. 1250, 18 L.Ed.2d 357 (April 17, 1967).

7. See n. 2, supra.

8. See Plaintiffs' Memorandum of Law, pp. 18–19; Brief for Petitioner Brotherhood of Railroad Trainmen, p. 30, Pennsylvania R. R. Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480 (1957).

two decisions construing the controversial provision of law. While broad language in both opinions lends some support to the Brotherhood's argument, neither case squarely raised the issue presently before this Court.

In Pennsylvania R. R. Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480 (1957), an operating employee of the railroad had been discharged after resigning from the Brotherhood and contemporaneously joining the United Railroad Operating Crafts, a union which he "believed in good faith to be 'national in scope' and 'organized in accordance with' the Act," although it had never qualified as an elector to the First Division of the National Railroad Adjustment Board. The union shop provision of the Brotherhood's collective bargaining agreement was expressly conditioned by the precise language of Section 2, Eleventh (c).

Tracing much of the legislative history, the Court observed that the purpose of Congress was not "to give employees in the railroad industry any blanket right to join unions other than the authorized bargaining representative, or to help dissident or rising new unions recruit new members" (352 U.S. at 488–489, 77 S.Ct. at 425); rather, the very narrow purpose was "to prevent compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts." (352 U.S. at 492, 77 S.Ct. at 427.)

Inquiring, then, into the "manner in which Congress achieved this purpose," the Court concluded that Section 2, Eleventh (c) did not permit alternative membership in merely " 'any' labor organization which was national in scope and organized in accordance with the Act," but only in "such unions as have already qualified as electors" to the First Division of the National Railroad Adjustment Board under Section 3 of the Act. 352 U.S. at 495–496, 77 S.Ct. at 429.

While the Brotherhood quotes various passages from the Rychlik opinion in support of its present contentions, it is clear that the explicit holding of the decision is not apposite. Moreover, one may—with equal facility—draw inferences from Rychlik which are contrary to the Brotherhood's position here.

The other decision relied upon by the Brotherhood is Rohrer v. Conemaugh & Black Lick R. R. Co., 359 F.2d 127 (3d Cir. 1966). There, the Brotherhood sat on the other side of the fence, inasmuch as the plaintiff—an employee of the defendant railroad—had been discharged after changing membership from the United Steelworkers of America to the Brotherhood. The Steelworkers union was the designated representative for all crafts and classes of employees on the defendant railroad, a subsidiary of the Bethlehem Steel Corporation—as it was on all other Bethlehem railroad subsidiaries. Its collective bargaining agreement with the defendant railroad contained a strict union shop clause.

Relying upon language in Rychlik, the Court of Appeals held that Section 2, Eleventh (c) was inapplicable to the factual situation presented because the plaintiff was "not faced with the dilemma of intercraft mobility." (359 F.2d at 130.) That factual situation, however, is clearly distinguishable from the one now before this Court. Although certification by the National Mediation Board on the Conemaugh & Black Lick R. R.—as on all railroads—is by craft or class, the Steelworkers union in fact represented "all the employees of the Railroad without regard to craft or class delineations." (359 F.2d at 130.) Indeed, the Steelworkers union has been certified as the representative of all employees since 1947, is not a railroad craft union but an industrial union, and has never qualified as an elector to the First Division—or any other division—of the National Railroad Adjustment Board.

Rohrer, therefore, presents a special situation which properly should be limited to its particular facts. To the extent that the decision is persuasive of the Brotherhood's contentions in the instant

litigation, the Court is of the opinion that it should not be followed.

## II. PLAINTIFFS' IRREPARABLE INJURY

■ Plaintiffs having made the "clear showing of probable success"[9] cited by decisions of this Circuit as a prerequisite for the granting of a preliminary injunction, we turn to an examination of those other desiderata which a district court is compelled to evaluate in exercising its sound discretion.[10] In the particular circumstances of this case, primary emphasis must lie with the need to preserve the status quo pending a final determination on the merits.

Here, the individual plaintiffs—and the members of the class they represent—have been caught in the crossfire of an interunion dispute which has been brought to a head by the recently executed union shop agreement. Unless enforcement of the strict union shop clause is temporarily suspended, these employees shortly[11] will be required to choose a course of conduct which may have a crucial and irreversible effect upon their seniority rights, insurance coverage, and other employment benefits. It is neither fair nor necessary to require these employees to make such a vital decision while their right to maintain membership in the Switchmen's Union alone is being adjudicated. This is particularly so, where the plaintiffs' ultimate rights and remedies may vary markedly according to the course of conduct chosen in the interim. Even if the plaintiffs are eventually successful, their remedy at law may have been rendered wholly inadequate by the course they might choose to protect themselves now.

In sharp contrast, the Brotherhood can show little in the way of potential injury if the defendants are restrained from enforcing the union shop agreement against members of the Switchmen's Union, until the agreement's legality under the Railway Labor Act has been adjudicated. Since the enactment of the 1951 amendments, the Brotherhood has represented crafts and classes of employees on the defendant railroad under union shop provisions explicitly limited by the express language of Section 2, Eleventh (c). No claim has been made on behalf of the Brotherhood that the situation suddenly has become critical, and the Court perceives no precipitative circumstance.

Thus, when the present and potential injury to the plaintiffs is weighed against the present and potential injury to the defendants, the balance of convenience inclines heavily on the side of the plaintiffs.[12]

The defendants, singularly and collectively, and their officers, servants and representatives are hereby restrained—pending a final determination of this action—from discharging, or threatening to discharge, or attempting to cause the discharge of the plaintiffs or any other employee of the defendant railroad for failure to join or maintain membership in the defendant Brotherhood of Rail-

---

9. Ames v. Associated Musicians, 359 F.2d 777, 779 (2d Cir. 1966), quoting from Societe Comptoir De L'Industrie, etc. v. Alexander's Dep't Store, 299 F.2d 33, 35, 1 A.L.R.3d 752 (2d Cir. 1962). The Court of Appeals has stated recently that the "burden is less where the balance of hardships tips decidedly toward the party requesting the temporary relief." Dino de Laurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir. 1966). Accord, Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204–205 (2d Cir. 1966).

10. Santos v. Bonanno, 369 F.2d 369, 370 (2d Cir. 1966); Huber Baking Co. v.

Stroehmann Bros. Co., 208 F.2d 464, 467 (2d Cir. 1953).

11. Indeed, while this motion was *sub judice*, the Brotherhood notified employees who were not members of the Brotherhood that they would be cited for non-compliance with the union shop agreement if they failed to make application for membership in the Brotherhood by April 30, 1967.

12. Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 310 (2d Cir. 1966).

road Trainmen so long as he maintains membership in the plaintiff Switchmen's Union of North America.

This opinion constitutes the findings of fact and conclusions of law required under Rules 52 and 65 of the Federal Rules of Civil Procedure.

So ordered.